[Crim. No. 11103.   Second Dist., Div. One.   Aug. 18, 1966.]

THE PEOPLE, Plaintiff and Respondent, v. HORACE SONNY LEWIS, Defendant and Appellant.

Horace Sonny Lewis, in pro. per., and Irving S. Feffer, under appointment by the District Court of Appeal, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and Walter E. Wunderlich, Deputy Attorney General, for Plaintiff and Respondent.

WOOD, P. J.—Defendant Horace Sonny Lewis and Carolyn E. Lewis, his wife, were accused in count 1 of murder, and in count 2 of robbery. In count 3, Carolyn was accused of receiving stolen property. Defendant Horace Sonny Lewis admitted an allegation of the information that he had been convicted previously of a felony (armed robbery, in Michigan). The defendants pleaded not guilty. During a jury trial, Carolyn pleaded guilty to count 3 (receiving stolen property), and thereupon counts 1 and 2 were dismissed as to her. The jury found defendant Horace Sonny Lewis guilty of murder in the first degree, and fixed a penalty of life imprisonment; it also found him guilty of robbery in the second degree. He was sentenced to life imprisonment on the murder conviction, and to imprisonment for the term prescribed by law on the robbery conviction. He appeals from the judgment.

Appellant (referred to as the defendant) contends that the court erred as follows: In receiving in evidence defendant's confession. In receiving in evidence defendant's fingerprints. In not granting defendant's motion for an order declaring a mistrial, after the codefendant Carolyn Lewis pleaded guilty to receiving stolen property.

On August 7, 1964, about 6 p.m., when Mrs. Saffold returned to her apartment at 4521 Dockweiler Street in Los Angeles, she observed that some of the furniture therein had been moved, and that ashes, a wet spot, and a brief case were on the floor; and, having concluded that someone had entered her apartment, she called the police. Soon thereafter Officer Bridges arrived and found the dead body of Francine D. Wallweber in a bedroom closet of the apartment. A portable sewing machine was on her body, a wire or extension cord was around her ankles, and a scarf and belt were around her neck. Other officers came there to assist in the investigation.

Miss Wallweber, 29 years of age, who was a saleslady for the Michelangelo Wig Company, gave wig demonstrations at various places pursuant to appointments made by the company. In July 1964, when she gave a wig demonstration at 1319 South Oxford Avenue, the defendant assisted her in carrying her suitcases (containing sample wigs and a mannequin head) into the house. She went there in her blue Pontiac car.

The defendant is related to Mrs. Saffold by marriage—he is a nephew of her aunt's husband. Defendant visited Mrs. Saffold at her apartment on August 5, 1964,—she did not give him a key to her apartment, nor give him permission to use her apartment. On that day, August 5, the defendant telephoned the mother of Mrs. Saffold and obtained from her the unlisted telephone number of Mrs. Saffold.

On August 7, 1964, pursuant to request of defendant, Mrs. Dillard telephoned the Michelangelo Wig Company and made an appointment for a wig demonstration to be given on that day at 4521 Dockweiler Street, and she gave the telephone number of that address, and the name of Caroline Jones or Caroline Brown, to the company.

Mrs. Saffold, who was employed, was not at home on August 7 until approximately 6 p.m. Mrs. Satches, who resided in the apartment which adjoins the Saffold apartment, heard the Saffold telephone ring twice on August 7—the first ring was about 10:30 a. m., and the second one was about 1:30 p.m. About an hour and a half later she heard the Saffold doorbell ring, and then she saw a light blue car which was parked in front of the apartment house. About five minutes after the doorbell rang, she heard screams of a woman, and after the screaming stopped she heard the sounds of running water, closing doors, and ''boxes'' in the Saffold apartment. About half an hour later, she heard the front door of that apartment open or close, and she went to the front window of her apart-

ment and saw a Negro man close to the parked car—he was wearing dark glasses and was lifting a rectangular suitcase into the car. She saw the man get into the car and try to start it—it did not start right away but finally it started and he drove away.

On August 7, about 3 p.m., the defendant arrived at the home of Mrs. Solomon on East 49th Street, and gave her a wig. She asked him where he got it, and he replied that he was helping a friend sell them. He asked her to let him know, if she knew anyone who wanted to buy a wig. Later, Mrs. Solomon delivered the wig (she had received) to the police.

About 5:45 p.m. on August 7, the defendant arrived at the home of Mrs. Williams, at 1605 West Vernon Avenue, where his wife (codefendant Carolyn Lewis) resided and was employed as a babysitter. (The defendant also had lived there from July 5 to approximately July 24.) In the presence of Mrs. Williams, the defendant told his wife that he was going to take her (wife) to some clubs that night. He returned there about 8:30 p.m. to get his wife, and while they were leaving the house, Mrs. Williams noticed that codefendant Carolyn was wearing a wig—Mrs. Williams had never seen her with a wig before that time. Neither of them (Lewises) returned to Mrs. Williams' home that night.

That night (August 7) about 10:30 o'clock, the defendant and codefendant Carolyn arrived at the home of Mrs. McAndrews, 1319 South Oxford Avenue (where the wig demonstration had been held in July)—they were in a blue Pontiac car, and at that time Carolyn was wearing a wig.

Mr. Taylor saw the defendant and Carolyn at Mrs. McAndrews' home on August 7 and at that time they (defendant and Carolyn) were in a blue Pontiac car, and at that time Carolyn was wearing a wig. They (defendants) took some of the neighbors for a ride in the car. Mrs. McAndrews saw the defendant show some money to the neighbors. The victim, Miss Wallweber, had withdrawn $300 from her savings account on August 7.

About 10 o'clock the next morning, August 8, when they (defendants) returned to Mrs. McAndrews' home, the defendant said that he was going to get an apartment. In the evening of that day, when they returned to that home, Carolyn told Mrs. McAndrews that they had found an apartment in the 1700 block on Vernon Avenue (about two blocks from Mrs. McAndrews' home).

The defendants were arrested on August 9, 1964, after officers had seen them walking on Vernon Avenue near

Western Avenue. At that time Carolyn was wearing a wig and carrying Miss Wallweber's (victim's) purse. The purse contained the victim's wrist watch and keys to the front door of 4521 Dockweiler Street.

On August 9, Officer Collins obtained a warrant to search the apartment which the defendants had rented at 1735 West Vernon Avenue. In that apartment the officers found two carrying cases in which there were 12 wigs—and in one of the cases there was a mannequin head. The cases, wigs, and mannequin head were identified as the property of the Michelangelo Wig Company and as the property which Miss Wallweber had in her possession. The officers also found, in the apartment, an ignition key and a trunk key for the victim's blue Pontiac car, and a key to the victim's apartment.

A latent fingerprint was removed from a door window on the right side of the Pontiac car. The print was identified as defendant's fingerprint.

At the scene of the arrest (August 9), while the defendant was in a police car with Officer Collins, the officer asked him whether "he knew what he was under arrest for." The officer said that he was under arrest for murder, and that if he wanted an attorney he could have one. Defendant said, "I didn't murder anybody." The officer asked where the girl's car was. The defendant "indicated with a gesture over his right shoulder in an easterly direction; that the car was in that area." The officer asked him how he came in possession of the car. He said that on Friday (August 7 was Friday) about 10 o'clock he was near the Sears store and he saw Jill (victim) who had some wigs, and she let him use her car to go to the eastside to sell the wigs; the last time he saw her she was walking north from Pico Boulevard; he drove to the eastside and went past a friend's house, but the door was closed and he did not stop; that he was supposed to meet Jill about 11 o'clock on Oxford Street and return the car, but he never got around to it.

Also on August 9 (after the arrest), while the defendant was in jail at the police station, he requested permission to talk to Officer Collins. That officer went to the jail and the defendant stated that he wanted to talk to the officers again. While Officer Collins was bringing the defendant upstairs to the detectives' room, he (officer) said to defendant: "You don't have to talk to me now unless you want to." The officer also said: "If we are going up here and waste our time, I just don't want to talk to you." In a tape-recorded conversation

which followed, approximately at 8 p.m., the defendant stated, among other things, that he had gone to the Dockweiler Street apartment on August 7, waited therein for a wig saleslady to arrive, and after she arrived he grabbed and choked her, tied a scarf tightly around her neck, caused her to become unconscious, tied her legs, put her in a closet and placed a sewing machine on her body, took her carrying cases, wigs, purse and contents of purse, went out of the apartment, and entered her automobile and drove away. His statement was a confession of having committed the homicide and robbery.

Defendant did not testify, nor call any witness on his behalf (except that he did testify, out of the presence of the jury, regarding the issue as to whether he was advised of his rights).

Appellant contends that the court erred in receiving his confession and other statements in evidence, for the reason that he was not advised of his right to counsel and his right to remain silent.

■ With reference to the conversation with defendant at the scene of and immediately after the arrest (above stated), it is clear that at the beginning of the conversation he was advised of his right to counsel. As above shown, the officer said: "You have the right to an attorney or a lawyer if you want one." He was not told (as to this conversation) that he had a right to remain silent, but it appears that the questions by the officer did not constitute a process of interrogations that lent itself to eliciting incriminating statements, but that they were general inquiries made immediately after the arrest whereby the defendant was given an opportunity to explain the circumstances of his possession of the Pontiac car on the evening of the homicide. (See *United States* v. *Konigsberg,* 336 F.2d 844, 853; cited with approval in *People* v. *Stewart,* 62 Cal.2d 571, 578 [43 Cal.Rptr. 201, 400 P.2d 97].) Furthermore, the statements of defendant in that conversation were exculpatory. After the officer had asked him whether he knew the charge against him, and after the officer had told him that the charge was murder, the defendant said that he had not murdered anybody. When the officer asked him where the girl's car was, the defendant pointed in a certain direction (thereby indicating that he knew where the car was), but he then explained that she had given him permission to use the car while he was trying to sell wigs for her. His statement that he used the car was cumulative of the testimony of Mrs. McAndrews and Mr. Taylor (People's witnesses) that they had seen him driving the car in the evening of August 7. The

statements of the defendant in the conversation immediately after the arrest were admissible in evidence.

██ With reference to the defendant's statements at the police station in the evening of the day of the arrest (above stated), it is clear that prior thereto he had been advised of his right to counsel. He had been told at the time of the arrest, as above stated, that he had the right to an attorney if he wanted one. During the booking procedure at the police station the defendant was given a receipt for his property, which receipt is referred to by the officers as a "blue slip," and on the back of it there were instructions which, in part, were to the effect that he might be visited by an attorney upon his request, and he might use the telephone to call an attorney. Later that day and prior to the conversation, while the defendant and four other prisoners were together in the jail, the officer repeated some of the instructions which were on the "blue slip" and told those persons that they had a right to contact an attorney. In the evening of that same day, after defendant had asked permission to talk to the officer, and while (pursuant to the request) the officer was taking him to the detectives' room, the officer told him that he should read the blue slip[1]—that it was about getting an attorney, what rights the defendant had, and what he should do. It thus appears that the defendant was advised on various occasions, prior to the confession conversation, that he had a right to be represented by counsel. ██ Also, while the officer was taking the defendant to the detectives' room, he told the defendant: "You don't have to talk to me now unless you want to." This was a sufficient compliance with the rule that a defendant should be advised of his right to remain silent. This case was tried in December 1964, which was prior to the decision in *Miranda* v. *Arizona* (June 13, 1966), 384 U.S. 436 [86 S.Ct. 1602, 16 L.Ed.2d 694]. Under such circumstance that decision does not apply retroactively herein. (*Johnson* v. *New Jersey*, 384 U.S. 719 [86 S.Ct. 1772, 16 L.Ed.2d 882].) In the present case, the court did not err in receiving the confession conversation in evidence.

██ Appellant contends further that the court erred in receiving evidence that defendant's fingerprint was on the Pontiac car. He argues to the effect that the taking of his

---

[1]Appellant asserts in his brief that it was not shown that he could read. While he was testifying, out of the presence of the jury regarding the issue as to whether he was advised of his rights, he said that he could read. (Transcript, p. 302.) Other transcript references indicating his ability to read are on pages 329 and 331.

fingerprints, without having advised him as to his rights with reference to supplying the prints, violated his constitutional right against self-incrimination. In *People* v. *Graves,* 64 Cal. 2d 208 [49 Cal.Rptr. 386, 411 P.2d 114], wherein a similar argument was made with reference to handwriting exemplars, it was held that the exemplars were admissible in evidence. It appears that the question as to admissibility of fingerprints is determinable upon the same basis that the question of admissibility of handwriting is determinable. In the present case the court did not err in receiving the evidence as to fingerprints.

Appellant also asserts that the court erred in denying his motion for an order declaring a mistrial, after codefendant Carolyn Lewis, during the trial, pleaded guilty to receiving stolen property, and the charges of murder and robbery were dismissed as to her. His argument is to the effect that since there was much testimony which linked the codefendant Carolyn Lewis with him, the incriminating evidence linking her to the alleged crimes of murder and robbery had the effect of prejudicing his rights. He cites *People* v. *Aranda,* 63 Cal.2d 518 [47 Cal.Rptr. 353, 407 P.2d 265], wherein a judgment of conviction was reversed because a codefendant's confession, which implicated Aranda, was received in evidence. In the present case, appellant asserts that even though no confession of Carolyn Lewis is involved, the case of appellant Lewis is analogous to the *Aranda* case in that the evidence herein as to Carolyn was received and the case was dismissed as to her. Appellant has not specified any evidence against codefendant Carolyn, nor specified any of the prosecution's opening statement regarding her, which he contends prejudiced his right to a fair trial. In view of the overwhelming evidence against him, it is apparent that he was not prejudiced by the denial of his motion for an order declaring a mistrial.

Appellant contends further to the effect that the taking of his confession statement, without having warned him that it was being tape recorded, rendered the statement inadmissible. There is no merit to this contention.

The defendant was accorded a fair trial, and there is no reversible error.

The judgment is affirmed.

Fourt, J., and Lillie, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied October 14, 1966. Peters, J., and Tobriner, J., were of the opinion that the petition should be granted.