[Crim. No. 12386. Second Dist., Div. One. Mar. 10, 1967.]

THE PEOPLE, Plaintiff and Respondent, v. JOSE BLAS VALENCIA, Defendant and Appellant.

Donald C. Knutson, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and S. Clark Moore, Deputy Attorney General, for Plaintiff and Respondent.

LILLIE, J.—Defendant was charged with the crime of murder (Pen. Code, § 187) and two prior convictions (unlawful taking of a motor vehicle and violation of section 11530, Health and Safety Code). The cause was submitted to the trial judge on the transcript of the testimony taken at the preliminary hearing, she found defendant guilty of voluntary manslaughter, a lesser and necessarily included offense, and the prior convictions to be true. Defendant appeals from the judgment.

On September 21, 1965, around 10 p.m., defendant entered the Pico Inn where Ochoa, the bartender, served defendant a bottle of beer, then a glass of wine. Half an hour later, Fernandez, the manager, walked up to defendant and grabbed his glass of wine telling him, "I'm closing up, so you get out of here"; defendant replied, "Let me finish my drink." Fernandez said, "No, I'm closing up," then grabbed a club and tried to hit defendant with it, but Ochoa got in the middle and put his hand on Fernandez. Meanwhile, defendant had gotten off his stool; Ochoa grabbed him and told him he would save his drink for the next day, then walked him toward the door suggesting they go some place and have a beer. Fernandez had been drinking all day and was under the influence of alcohol.

What occurred thereafter is contained in defendant's statement to Officer Cline. Defendant left the bar and walked west on Pico to see a friend; realizing it was too late, he turned and walked east to return to his father's home. Arriving at Pico and Valencia he saw Fernandez, who had closed up the bar, standing on the corner. Fernandez said, "You came back to finish it off?"; defendant replied, "Well, whatever you want to do . . . Let's duke it out." They walked to the alley and Fernandez exhibited the club in a menacing manner. Defendant picked up a broom which was lying in the alley and jabbed Fernandez in the stomach; as Fernandez bent forward defendant hit him in his face with his knee and took the club away from him. He hit Fernandez three or four times, knocking him to the ground, stepped over Fernandez and hit him again several times—"I hit him I don't know how many times"—threw the club in the trash barrel and walked away. Fernandez died as a result of a fractured skull caused by a cylindrical object approximately the size of a baseball bat.

Seven days later (September 28) around 1:45 a.m., defendant voluntarily walked into the police station. Officer Cline advised him of his constitutional rights—"that he had a right

to remain silent, and that he could have the services of an attorney, and that anything he would say could be held against him in a subsequent criminal trial''; in response defendant said, ''that he understood.'' He was then arrested. About 12 hours later, around 1:35 p.m. (September 28), Officer Cline again advised him of his constitutional rights. He said, ''Do you remember me advising you of your constitutional rights last night or early this morning?''; defendant stated, ''Yes.'' The officer then repeated ''that he had a right to an attorney and that anything he said may be held against him in a subsequent trial and that he need not say anything 'at this time' ''; and continued, ''that is, you have the right to have the services of an attorney, and that anything you may say could be held against you in a subsequent criminal trial''; in a response thereto, defendant ''said he understood.'' Defendant then related the events of September 21 to which the officer testified at the preliminary hearing and which are set out in the preceding paragraph—that he was in a fight with Fernandez, disarmed him, knocked him to the ground and hit him with a club. After making this statement to Officer Cline, defendant repeated it before a shorthand reporter who recorded and transcribed it (Exh. 6); the transcribed statement was concluded around 2:30 p.m. (The oral and written statements were freely and voluntarily made by defendant and no force, coercion or duress were used or promises of reward, lesser sentence or leniency made.) Officer Cline then told defendant ''we wished to go through the entire crime itself and [sic] scene and that if he agreed upon it, we would do it approximately 9 o'clock that evening. . . .''; defendant answered, ''It's all right with me.'' The officer then told him that ''he did not have to do this if he didn't want to; it was entirely up to him,'' but defendant replied, ''Well, I'd rather. I would like to get it cleared up.'' About five hours later, at 9 p.m. (September 28), defendant was taken to Pico and Valencia where he ''went through the entire crime as told to us by defendant, and at the same time recording this on film'' (Exh. 13), which was viewed by the trial judge. Thereafter Officer Cline testified to statements made by defendant during the re-enactment which were substantially the same as his prior statements.

Defendant offered evidence to the effect that he acted in self-defense. He did not testify, but on his behalf witnesses gave testimony tending to show that Fernandez had a reputation of being a violent, quarrelsome and dangerous person and one

who would provoke a dangerous encounter when he was under the influence of alcohol. Other evidence tended to show that Fernandez was intoxicated at the time of the encounter.

Appellant's first point, that he was not informed of his constitutional right to have counsel appointed to represent him, is based upon *Miranda* v. *Arizona,* 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602]. Twice, before making any statement, Officer Cline advised defendant "that he had a right to remain silent, and that he could have the services of an attorney, and that anything he would say could be held against him in a subsequent criminal trial." At the trial no objection was made to either the officer's testimony or the recorded statement (Exh. 6). Thus, defendant must have felt, as we conclude, that he had been effectively advised of his constitutional rights under *Escobedo* v. *Illinois,* 378 U.S. 478 [12 L.Ed.2d 977, 84 S.Ct. 1758], and *People* v. *Dorado,* 62 Cal.2d 338 [42 Cal.Rptr. 169, 398 P.2d 361]. While *Miranda* v. *Arizona,* 384 U.S. 436, 444-473 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974], requires that an accused also be advised that he may have a lawyer appointed for him if he cannot afford one, *Miranda* was not decided until June 13, 1966; the trial herein commenced on December 13, 1965. Inasmuch as *Miranda* applies only to those cases in which the trial commenced after *Miranda* was decided (*People* v. *Rollins,* 65 Cal.2d 681, 683 [56 Cal.Rptr. 293, 423 P.2d 221]), the instant case is controlled by the principles of *Escobedo* and *Dorado,* under which the officers fully and effectively advised defendant of his constitutional rights.

Appellant's contention that the film was inadmissible in evidence because, as he objected at the trial, he was not advised of his constitutional rights immediately before he re-enacted the crime at the scene, is also without substance. He concedes that "It could be argued that *Dorado* has been complied with since the defendant was warned of his constitutional rights at the time of the arrest and at the time of the statement," but that the argument is not valid for two reasons: (1) the manner "in which the police advised the defendant of his right to the presence of an attorney was not effective" and (2) assuming that the warning was sufficient, the time span between the warning and the re-enactment was so great that it cannot be assumed that he was effectively advised of his rights.

Appellant complains that the warning that "he could have the services of an attorney" was deficient in that it

implies that he can have an attorney if he can pay for one, and fails to convey the impression that he can have an attorney with him during the interrogation. At the outset, defendant was warned "that he could have the services of an attorney"—no objection that this ineffectively advised him of his rights was interposed in the trial court. The second warning, "that you have the right to have the services of an attorney," and "that he had a right to an attorney," likewise was not challenged in the court below. These warnings are sufficient compliance with the rule under *Dorado* and *Escobedo* that the accused must be advised of "his right to counsel." █ Whether he has been adequately informed must be determined by the substance of the warning and not by its form. (*People* v. *Lewis,* 244 Cal.App.2d 325, 331 [53 Cal. Rptr. 108].) █ As to giving any warning that defendant had a right to have counsel appointed to represent him at the interrogation, under *Escobedo* and *Dorado,* the officers had no such duty, *Miranda* v. *Arizona,* 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974], not having been in effect at the time of trial. (*People* v. *Rollins,* 65 Cal.2d 681, 683 [56 Cal.Rptr. 293, 423 P.2d 221].)

█ Appellant's second argument is that he was not advised of his constitutional rights when he re-enacted the crime for the film, and did not effectively waive them. At this point the time involved and the sequence of events after defendant walked into the police station are significant. At the time of his arrest (1:45 a.m., September 28), defendant was properly and fully advised after which he told the officer that he understood his constitutional rights. Twelve hours later (1:35 p.m.) he was again properly and fully advised of his constitutional rights after which defendant again told the officer that he understood them, and then related the events of September 21, later repeating the statement that it might be recorded and transcribed (Exh. 6). After this, Officer Cline told the defendant that "we wished to go through the entire crime itself and [*sic*] scene and that if he agreed upon it, we would do it at approximately 9 o'clock that evening"; defendant answered, "It's all right with me"; Officer Cline then advised that he did not have to do it, that "it was entirely up to him"; defendant replied, "Well, I'd rather. I would like to get it cleared up." Five hours later (9 p.m.) the officers took him to the scene where he re-enacted the crime and the film was made.

The essence of *Escobedo* and *Dorado* is that the accused be

effectively advised of his constitutional rights so that if he decides to make a statement to law enforcement officers his waiver of the privilege against self-incrimination and his right to counsel will be "intelligently and knowingly" made. (*Escobedo* v. *Illinois*, 378 U.S. 478, 490, fn. 14 [12 L.Ed.2d 977, 84 S.Ct. 1758]; *People* v. *Dorado*, 62 Cal.2d 338, 352 [42 Cal.Rptr. 169, 398 P.2d 361].) ▇▇▇ Thus, if there is evidence that defendant already knew and understood that he had a right to remain silent and that he had a right to counsel during his re-enactment of the crime, the failure of Officer Cline to repeat the warning to him immediately before, does not preclude a finding that defendant knowingly waived those rights. (62 Cal.2d at 352; *People* v. *Mathis*, 63 Cal.2d 416, 432 [46 Cal.Rptr. 785, 406 P.2d 65].)

▇▇▇ "It is clear that the question of whether or not there has been a waiver is primarily a question for the trial judge and his determination thereon should not be disturbed by a reviewing court unless it is palpably erroneous." (*People* v. *Stafford*, 240 Cal.App.2d 422, 424 [49 Cal.Rptr. 598].)

▇▇▇ In determining whether a waiver was "intelligently and knowingly" made, the circumstances of the interrogation and the suspect's capacity to understand the consequences of his actions are factors. (*In re Schlette*, 232 Cal.App.2d 407, 412 [42 Cal.Rptr. 708].) ▇▇▇ First, the record clearly supports the finding that before defendant re-enacted the crime he well knew and fully understood his rights to be represented by counsel and to remain silent, and that anything he might say could be used against him, for he said so on the two occasions he was so advised by Officer Cline. Second, Officer Cline's testimony shows that it was in the afternoon, after his statement was recorded and as a part of his second encounter with the officer, before which he was advised of his rights, that defendant agreed to re-enact the crime for the film. Defendant had three encounters with the police—when he walked into the station (1:45 a.m.) whereupon he was advised of his constitutional rights; 12 hours later (1:35 p.m.) when he was again advised of his rights after which he made an oral statement, repeated the same to be recorded and agreed to re-enact the crime at 9 o'clock that evening; and five hours later (9 p.m.) when he was taken to Valencia and Pico. It was at the end of the second that he was told by Officer Cline that "if he agreed upon it" they would re-enact the crime at 9 o'clock; it was then defendant said it was all right with him, the officer warned him that he did not

have to do it, and defendant replied that he'd rather, he'd like to get it cleared up. Third, the key to the entire issue raised by appellant is his statement to Officer Cline—"Well, I'd rather. I would like to get it cleared up." His eagerness to tell the police his story was apparent at the very outset, when he walked into the police station at 1:45 a.m. The fact is, and it is not denied, that he surrendered himself in the hope that he could clear himself of the death of Fernandez by telling the police that he acted in self-defense and that Fernandez died as the result of his own aggression; appellant even concedes that he "voluntarily appeared at the police station at 1:45 a.m. on September 28, 1965, . . . to admit that he participated in the fight which led to the death of Juan Fernandez." Even then, the police officer did not take his statement until *twice* he had been advised of his constitutional rights and *twice* he had responded that he understood them. (*People* v. *Gilbert,* 63 Cal.2d 690, 700 [47 Cal.Rptr. 909, 408 P.2d 365].) There can be little doubt that defendant knew, appreciated, and understood his constitutional rights when he agreed to and did re-enact the crime for the film, and that he consented to do it for but one purpose—to clear himself of the death of Fernandez; the film was not the product of any ignorance of his rights to remain silent and to counsel.

The real impetus for his participation in the re-enactment of the crime at Pico and Valencia, as well as for his prior statements, was not any inquiry by or imposition of the police but the defendant's desire to vindicate himself; and the expression of his rights in the form of another, a third, police warning merely for the sake of repetition was superfluous. (*In re Schlette,* 232 Cal.App.2d 407, 412 [42 Cal.Rptr. 708].) The purpose of requiring that an accused be advised of his rights is not to impose upon the police the performance of a formulary gesture, but in fact to protect his right to counsel and right to remain silent; this the officer had done, twice before. We conclude, in view of the clear warnings to defendant, his general appreciation of his situation, his repeated acknowledgment that he understood his constitutional rights, and his eagerness to make a clean breast of the killing in order to exculpate himself, that defendant knowingly and intelligently waived his rights to counsel and to remain silent. (*People* v. *Mitchell,* 244 Cal.App.2d 176, 179-182 [52 Cal.Rptr. 884].)

Where, as here, there has been a waiver, no reason suggests itself why it should not cover subsequent repetition

of substantially the same incriminating statements (*People* v. *Garner*, 234 Cal.App.2d 212, 224 [44 Cal.Rptr. 217]), especially when they were made only several hours apart. Appellant's contention that the film was not "merely cumulative" because it contained "a description of the defendant straddling Juan Fernandez and striking him after he was on the ground" is without merit. An examination of defendant's two prior statements shows that the film was clearly cumulative; and while the film does contain a description of defendant straddling the victim and hitting him while on the ground, it is the same description he had previously given to the officer who testified that defendant "stated, he hit him [Fernandez] three or four times, knocking him to the ground. He then stated that he stepped over the victim and hit him several more times; . . ."

The judgment is affirmed.

Wood, P. J., and Fourt, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied May 4, 1967.