[Crim. No. 2781. Fourth Dist., Div. Two. Apr. 1, 1968.]

THE PEOPLE, Plaintiff and Respondent, v. DENNIS RAY
BOLINSKI, Defendant and Appellant.

James L. Kellam for Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and Richard Tanzer, Deputy Attorney General, for Plaintiff and Respondent.

TAMURA, J.—Following a jury trial defendant was found guilty of first degree murder and the penalty was fixed at life imprisonment. Defendant appeals from the judgment of conviction, order denying new trial and order denying a motion for reduction of sentence. The latter two orders being non-appealable, the appeals therefrom must be dismissed.[1]

The charge arose out of the disappearance on August 20, 1965, of one Paul Morrow Taylor, a relief manager for Western Union, who was then stationed at Palm Springs. No one has seen him or heard from him since and, according to the record and evidence before us, his body has never been found.

Defendant contends that corpus delicti was not established and that certain extrajudicial statements were received in evidence in violation of the rules enunciated in *Miranda* v. *Arizona*, 384 U.S. 486 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974]. We have concluded that prima facie proof of corpus delicti was established but that certain extrajudicial statements made by defendant should have been excluded and that the judgment should therefore be reversed.

Paul Morrow Taylor was a 51-year-old bachelor who was described as heavy-set with reddish hair and weighing about

---

[1]Penal Code, section 1237; *People* v. *King*, 60 Cal.2d 308, 309 [32 Cal. Rptr. 825, 384 P.2d 153]; *People* v. *Hawkins*, 249 Cal.App.2d 379, 381 [57 Cal.Rptr. 522]; *People* v. *Cantrell*, 197 Cal.App.2d 40, 43 [16 Cal. Rptr. 905]; *People* v. *Peter*, 125 Cal.App. 657, 659 [14 P.2d 166].

185 pounds. He had a sister, Mrs. Maude Gruber, who resided in Pacific Grove, California. Mr. Taylor used his sister's address as his permanent address and received all of his mail there. As a relief manager he was assigned to various Western Union offices throughout the state and spent little time at his sister's home. However, she did see him at least once every four or five months. Mrs. Gruber last saw him in June 1965 and has not heard from him since August 20, 1965.

For the month of August, 1965, Mr. Taylor had been assigned to the Western Union office in Palm Springs. He had taken a room at a Palm Springs motel and had paid a month's rent in advance.

On August 20, 1965, at about 4:30 p.m., as he left the office, he remarked to Mrs. Eastman, a clerk, "Well, I guess I'll go." Mrs. Eastman said, "Yes, have fun," to which Mr. Taylor replied, "Well, you're the one who should have fun, you're off this weekend, I have to work." He was in a good mood and did not appear to be upset in any way. When he failed to appear for work the following morning efforts were made to locate him but they proved fruitless. Neither his sister nor any of his associates or friends have seen him or heard from him since that afternoon.

An examination of the office cash and records revealed that everything was in order. His weekly pay voucher was found in the office uncashed. Company records revealed that on the date of his disappearance he was only twelve days short of qualifying for a company retirement pension of $130.50 per month. His motel room was found to be undisturbed and in order; his shaving gear, toilet articles, personal effects and clothing were still in the room.

Mr. Taylor owned a 1964 Oldsmobile. He was a numismatologist and collector of $2 bills.

A check of service stations in the area revealed that between 9:30 a.m. and 5:30 p.m. of August 20 a credit card purchase for Mr. Taylor's automobile was made in Indio and that sometime between 10 p.m. and 8 a.m. of August 21 a purchase was made in Needles. A handwriting expert testified that the signature "Paul Taylor" on the invoice for the Indio purchase was Mr. Taylor's signature but that the signature "Paul Taylor" on the Needles invoice was not his signature.

Defendant was 18 years of age at the time of the alleged offense. On August 4, 1965, he called Mrs. Gloria Myers who lived in Costa Mesa and who had known defendant for approximately 6 years and stated that he was in Costa Mesa with his wife and had no money or place to stay. Mrs. Myers

permitted defendant and his female companion, whom he introduced as his wife, to remain at her home for approximately two weeks. During that period defendant on several occasions displayed a revolver which he possessed.

On August 12 or 13, at Mrs. Myers' request, defendant left the Myers home leaving the girl behind. When Mrs. Myers learned that she was a juvenile and not his wife, she called the police and had her taken to juvenile hall. Mrs. Myers had several telephone conversations with defendant after his departure concerning the girl and the fact that the police were seeking an interview with him.

After leaving Mrs. Myers' residence defendant called a friend, Timothy McVicar, whom he had known for approximately 10 or 11 years and who lived in Orange, California. Defendant stayed at the McVicar home until August 20. During that period he displayed the revolver which, according to McVicar, defendant kept in an attache case.

On his way to work on August 20 at about 1 or 1:30 p.m. McVicar dropped defendant off at the Riverside Freeway on-ramp in Orange. Defendant said he was going back to Illinois. He was wearing a shoulder holster and carrying a piece of luggage.

On August 21, 1965, between 12:30 and 2 a.m. David Gerberding was hitchhiking at the outskirts of Kingman, Arizona. Defendant, driving Mr. Taylor's Oldsmobile, stopped and gave Gerberding a ride. Defendant stated that he was going to the east coast and that the car belonged to his father who was in a San Diego hospital. Gerberding noted that whenever they stopped to purchase gasoline defendant used a credit card and that defendant paid for his meals with $2 bills. The signatures on the invoices for gasoline purchases for the Taylor automobile made on the route taken by defendant were the same as the signature on the invoice for the purchase made in Needles.

On Sunday, August 22, at about 10 a.m. defendant and Gerberding arrived in Vandalia, Illinois, pulled into a combination gas station and restaurant and parked by the gas pumps. Defendant, as he had done during the entire trip, attempted to pump his own gas but the pump was locked. The two went into the restaurant where they were told that the station would not be open for about an hour. They decided to have lunch and placed their orders. Meanwhile State Trooper Morton who had been observing the pair pulled up in his patrol car and entered the restaurant. Upon seeing the trooper

defendant became nervous, insisted on cancelling their orders and leaving the restaurant. Upon defendant's insistence, they cancelled their order and left, entered the car, and defendant "took off like a bat out of Hades." Trooper Morton overtook them and stopped them. As Morton approached the vehicle defendant told Gerberding to put the credit cards into the glove compartment. Morton asked for and received defendant's driver's license and upon noting that the name on his license did not correspond with that shown on the registration certificate asked defendant to explain the discrepancy. Defendant said the car belonged to his uncle. Morton then escorted defendant and Gerberding to the county courthouse, radioed California authorities for a stolen vehicle check on the vehicle and upon receiving a "no stolen report," released the two. Meanwhile, however, Morton telephoned the police department in Pacific Grove and requested that it check at the address shown on the registration certificate to determine whether the vehicle had been stolen. Upon receiving a report that Mr. Taylor's sister had been contacted and that she had stated that Mr. Taylor had not reported to work for two days and that she had never heard of defendant Bolinski, Morton radioed ahead and defendant was stopped and taken into custody. Gerberding testified that upon their initial release, defendant drove at speeds ranging from 80 to 100 miles per hour.

Morton examined the Taylor vehicle and found that the trunk was filled to capacity. It contained among other items several suitcases under one of which he found a billfold containing approximately $500 in bills, consisting mostly of $20's and $2's. He also found $25 or $26 in the glove compartment, mostly in $2 bills. A search of defendant's person and of the car failed to reveal any revolver.

Charles R. Wood, an F.B.I. agent, interviewed defendant on August 22 and 23 in the county jail in Vandalia, Illinois and obtained from him a signed statement which was received in evidence and read to the jury. In the written statement defendant stated in substance: On the evening of August 18 while he was hitchhiking he was picked up by one Paul Taylor who was driving a 1964 Oldsmobile. They went to Las Vegas where defendant obtained some $2 bills and drove around the Boulder Dam area several times. Taylor said he was from Pacific Grove and that he worked for the government and did considerable travelling. Defendant told Taylor he was trying to get back to Ohio, that he and his wife lived in California, that she became pregnant, "got mixed up" and

returned to her parents. Taylor offered him the use of his car and credit cards to enable him to get back to Ohio. Defendant dropped Mr. Taylor off at a housing development in Pacific Grove with the understanding that he would return the vehicle to the address shown on the registration certificate on the completion of his mission. In trying to reach Route 66, defendant lost his way, travelled north of Las Vegas and into Kingman, Arizona, where he picked up Gerberding. They drove straight through to Vandalia, Illinois, stopping only for gas and meals. During the entire trip he used Mr. Taylor's credit cards.

Although there is no direct evidence as to what transpired between August 24, 1965, and March 4, 1966, remarks by counsel during the trial indicate that extradition proceedings were being held during that period and that defendant had remained in custody.

On March 4, 1966, Donald Bender, Deputy Sheriff of Riverside County and Paul Lewis of the Riverside County District Attorney's office took custody of defendant in Illinois for his return by automobile to Riverside California. They spent the night of March 4 in Oklahoma City and the next night in Albuquerque, New Mexico. Bender interviewed defendant at the city jail in Albuquerque and asked him to reveal the whereabouts of the body and the gun. Bender told defendant that they knew that he had a gun while he was in the Santa Ana area to which defendant replied, "Oh, that gun. I sold the gun to a friend, but the gun didn't have anything to do with it." When Bender asked defendant whether the gun was "out here or back east" defendant replied, "Back east." Bender also told defendant that since they would probably be taking the same route defendant had taken they would like to know if defendant would be willing to point out where the body might be located, assuring him that he would not be taken right up to the body. Defendant replied, "That won't bother me. I've seen dead people before."

After another overnight stop at Flagstaff, Arizona, they arrived in Riverside on March 7 and defendant was booked into the county jail.

On March 17, pursuant to defendant's request and with the approval of the public defender who was then representing him, Deputy Bender accompanied by an investigator from the public defender's office drove defendant along the route he claimed to have taken while hitchhiking and after he met Mr. Taylor. He pointed out where he commenced hitchhiking and

where he met Mr. Taylor. He remembered stopping in Indio with Mr. Taylor. He stated that he and Mr. Taylor went to Las Vegas and thereafter drove back to Orange County where he let Mr. Taylor off at the latter's home. He stated that Mr. Taylor had permitted him to take the car to go back east to straighten out his personal affairs, that from Orange County he drove towards Las Vegas, and that he lost his way and came to Kingman, Arizona, where he picked up a hitchhiker. He described Mr. Taylor as being about 30 years of age, dark haired and about 5 feet 9 inches tall.

On another occasion defendant asked Bender for permission to make a telephone call to his family in Maryland indicating that he would like to make the call where he could have some privacy. Bender permitted defendant to make the call from his office rather than from the jail telephone where most calls are made by prisoners. Defendant made a collect call to his sister in Maryland and the conversation was, unknown to defendant, recorded. He told his sister that the police wanted to know what he had done with the gun, that he told them he had sent it to her, and that she must testify in his behalf confirming that fact. She stated that she did not wish to commit perjury but would discuss the matter with their mother. In the course of the conversation she stated that she still had his shoulder holster, that there was no proof of defendant's guilt and "they can't say you killed someone without evidence." Defendant stated that "they" had no witnesses and didn't even have evidence that a crime had been committed.

Defendant did not take the stand. The only witnesses for the defense were an investigator and defendant's trial counsel who testified that during an interview with Mrs. Gruber she responded to an inquiry concerning her knowledge of homosexual activity on the part of Mr. Taylor, by saying, "Well, there's been some talk, a great deal of talk, and I don't know what to believe."

I

The corpus delicti of murder consists of two elements: the death of the alleged victim and the existence of some criminal agency as the cause, either or both of which may be proved circumstantially or inferentially. (*People* v. *Jacobson*, 63 Cal.2d 319, 326 [46 Cal.Rptr. 515, 405 P.2d 555]; *People* v. *Amaya*, 40 Cal.2d 70, 75 [251 P.2d 324]; *People* v. *Cullen*, 37 Cal.2d 614, 624 [234 P.2d 1]; *People* v. *Mehaffey*, 32 Cal.2d 535, 545 [197 P.2d 12]; *People* v. *Scott*, 176 Cal.App.2d 458, 489 [1 Cal.Rptr. 600]; *People* v. *Ogg*, 159 Cal.App.2d 38, 47 [323 P.2d 117]; *People* v. *Misquez*, 152 Cal.App.2d 471, 477

[313 P.2d 206]; *People* v. *Williams,* 151 Cal.App.2d 173, 177 [311 P.2d 117].) ██ The elements must be established independently of admissions or confessions of the defendant (*People* v. *Amaya, supra; People* v. *Cullen, supra*), but as a basis for introduction of the defendant's confession or admission, the prosecution is not required to establish corpus delicti by proof as clear and convincing as is necessary to establish guilt; a slight or prima facie showing is sufficient. (*People* v. *Mehaffey, supra,* at p. 545; *People* v. *Amaya, supra,* at p. 76; *People* v. *Cullen, supra,* at p. 624.) ██ Once corpus delicti is shown by independent evidence, the degree of the crime not being a part of the corpus delicti, the circumstances of the murder and its degree may be shown by extrajudicial statements of the accused. (*People* v. *Cooper,* 53 Cal.2d 755, 765 [3 Cal.Rptr. 148, 349 P.2d 964]; *People* v. *Miller,* 37 Cal.2d 801, 806 [236 P.2d 137]; *People* v. *Williams, supra.*) ██ It is for the trial court to determine whether a prima facie showing has been made. (*People* v. *Cullen, supra,* at p. 626; *People* v. *Scott, supra,* at pp. 464, 489-490.)

██ Production of the body of the missing person or of evidence of the means used to produce death are not essential to the establishment of corpus delicti or to sustain a murder conviction. (*People* v. *Cullen, supra,* 37 Cal.2d 614, 624; *People* v. *McMonigle,* 29 Cal.2d 730 [177 P.2d 745]; *People* v. *Scott,* 176 Cal.App.2d 458 [1 Cal.Rptr. 600]; *People* v. *Clark,* 70 Cal.App. 531 [233 P. 980].)

██ The evidence in the present case, exclusive of admissions of the defendant, was sufficient to permit a reasonable inference to be drawn that Mr. Taylor died and that his death was caused by a criminal agency.

Death may be inferred from the following facts: Mr. Taylor had been missing for a year; neither his sister with whom he communicated at intervals of not more than four or five months, his business associates, nor his friends have ever seen him or heard from him since August 20, 1965. The evidence is inconsistent with his voluntary departure or self-concealment. He apparently enjoyed good physical and mental health, no irregularities were found in his handling of office finances or records, his pay voucher was found uncashed at the office, he would have been entitled to a retirement pension in a few days, he had not been in the habit of failing to report for duty and his toilet articles, clothing and personal effects were still in his room at the motel where he resided.

That a criminal agency was the cause of death may be inferred from the following facts:

Defendant was known to have been armed with a revolver when he began hitchhiking on the Riverside Freeway on August 20. Mr. Taylor's friends testified he frequently picked up hitchhikers. Invoices for credit card purchases of gasoline for Mr. Taylor's vehicle showed that he made a purchase in Indio on August 20 and that either late the same night or early next morning a purchase was made by someone else in Needles using Mr. Taylor's credit card. The person who signed the invoice in Needles was the same person who signed the invoices for gas purchases on the route taken by defendant. Defendant was apprehended in Illinois on August 22 driving Mr. Taylor's automobile. En route defendant used Mr. Taylor's credit card for gasoline purchases and paid for his meals with $2 bills, a denomination which Mr. Taylor had been in the habit of collecting. When he saw Trooper Morton in the restaurant, defendant became nervous, insisted on leaving, cancelled a meal he had ordered, and drove off at high speed. The foregoing evidence coupled with Mr. Taylor's disappearance on August 20 was sufficient to give rise to a reasonable inference that Mr. Taylor met his death through a criminal agency.

Defendant seeks to distinguish *People* v. *Cullen, supra,* 37 Cal.2d 614, and *People* v. *Scott, supra,* 176 Cal.App.2d 458. He urges that in *Cullen* human blood stains were found on the floor and walls of the house where the victims and defendant resided and there was evidence of an attempt to sand the floor and to wash off the blood, and that in *Scott* the victim's dentures and eye glasses were found in an area adjacent to the premises of the family home. The presence or absence of a particular item of evidence is not controlling. The question is whether from all of the evidence it can reasonably be inferred that death occurred and that it was caused by a criminal agency.

Defendant argues that Mr. Taylor's disappearance is consistent with either amnesia or a heart attack suffered by him while strolling in the desert. However, the foundational evidence necessary to establish a corpus delicti need not eliminate possible non-criminal explanation of the victim's disappearance. ". . .[T]he foundation may be laid by the introduction of evidence which creates a reasonable inference that the death could have been caused by a criminal agency [citations], even in the presence of an equally plausible non-

criminal explanation of the event. [Citations]'' (*People* v. *Jacobson, supra,* 63 Cal.2d 319, 327.)

The evidence was sufficient to constitute prima facie proof of corpus delicti.

II

We next consider defendant's contention that statements made to Trooper Morton, F.B.I. Agent Wood and Deputy Sheriff Bender were received in violation of the rules enunciated in *Miranda* v. *Arizona, supra,* 384 U.S. 486 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974] ;. Since the trial of the present action commenced on September 2, 1966, *Miranda* rules govern (*People* v. *Rollins,* 65 Cal.2d 681 [56 Cal.Rptr. 293, 423 P.2d 221]) even though defendant's extrajudicial statements may have been admissible under *Escobedo* and *Dorado* standards. (*People* v. *Doherty,* 67 Cal.2d 9, 20-21 [59 Cal.Rptr. 857, 429 P.2d 177].)

A. *Statements to Trooper Morton:*

█ Defendant contends that the statement that the car belonged to his uncle, made in response to Trooper Morton's request to explain the discrepancy between the name on the driver's license and the name on the registration certificate, should have been excluded.

Although the officer testified that in his opinion the defendant was then under "technical arrest" for tampering with the gas pumps and for a traffic violation in failing to give proper signals on entering the highway, the inquiry was not designed to elicit incriminating statements concerning the "offenses" for which he was under "technical arrest," but to determine whether or not a different crime—auto theft— had been committed. This is demonstrated by the fact that when a "no stolen report" was received, defendant was immediately released. Considering the totality of the situation (*People* v. *Stewart,* 62 Cal.2d 571, 579 [43 Cal.Rptr. 201, 400 P.2d 97]) the inquiry had not reached the accusatory stage. (*People* v. *Graves,* 64 Cal.2d 208, 210 [49 Cal.Rptr. 386, 411 P.2d 114]; *People* v. *Cotter,* 63 Cal.2d 386, 393 [46 Cal.Rptr. 622, 405 P.2d 862]; *People* v. *Ford,* 234 Cal.App.2d 480, 492- 493 [44 Cal.Rptr. 556].) The statement was properly received in evidence.

█ Defendant contends that the following testimony by Trooper Morton concerning the examination of the vehicle following defendant's arrest should have been excluded:

"Q. Did you observe an attache case in the car?

"A. Yes, sir.

"Q. Did anyone make any claim to that?

"A. Yes, sir, Mr. Bolinski."

There was no *Miranda* violation. The exclusionary rules of *Miranda* pertain to statements and not to conduct.

B. *Statements to F.B.I. Agent Wood*:

Agent Wood testified that he first saw defendant in the county jail in Vandalia, Illinois, at 10 p.m. on August 22. He talked to him about an hour during which he asked defendant about the vehicle but, it being late in the evening, defendant declined to discuss the matter. At about 3:25 the following afternoon Wood again interviewed defendant and at 6:45 p.m. secured from him a written statement. Wood's testimony concerning the advisement he gave defendant at the commencement of the second interview was as follows:

"A. I told him that were [*sic*] investigating the possibility of a Federal violation in this eminating [*sic*] from the fact that this automobile had been transported across State lines; that he was under no obligation to tell me anything, and that he was entitled to the counsel of an attorney, and there would be no threats or promises made to him for information, and that if he was charged that he would be appointed counsel and competent counsel for his own use.

"Q. And would you relate, please, the basis or the gist of the conversation you had with him?

"Mr. Fahres: May I ask one question on voir dire, Your Honor.

"The Court: You may.

"Voir dire examination by Mr. Fahres:

"Q. Did you advise him in the event he was unable to afford private counsel, that he would be provided at no cost to him?

"A. Yes."

On cross-examination Wood testified that on the night of August 22 defendant declined to discuss how he came into possession of the vehicle and stated that he wanted a lawyer.[2]

[2] "Q Then you went back the next day, on August 23?

"A Yes, sir.

"Q You spoke with him again from 3:25 in the afternoon until sometime after 6:00 in the evening?

"A Yes, sir.

"Q And can you give me an idea, during that period of time, who was doing most of the talking? That is, were you talking more, or was Mr. Bolinski?

"A We had a—this was a conversation type of thing. We talked of Bolinski's family, his background, where he had gone to school; particularly, of course, how he came into possession of this automobile, and on the previous day, it was, of course, late in the evening, he didn't want

No effort was made to obtain an attorney for him although he was told that he was free to make a telephone call.[3] The fact that defendant expressed the desire to obtain the services of an attorney was corroborated by Trooper Morton who testified that prior to the interview by Agent Wood defendant told Morton that he wanted a lawyer.[4]

The attorney general argues that the statements elicited by F.B.I. Agent Wood were properly received in evidence because (1) the interrogation was investigatory; (2) the advisements were in substantial compliance with *Miranda* requirements; and (3) defendant failed to object and is thereby precluded from raising the issue of admissibility on appeal.

The contention that the interrogation was investiga-

---

to discuss this. He said he wouldn't mention how he came into possession of the car.

"Q Did he say he wanted a lawyer?

"A Did he want a lawyer?

"Q Yes.

"A Yes, he asked for a lawyer.

" . . . . . . . . . . . .

"Q During that period of time, from August 22, to 24, did Mr. Bolinski ever talk to a lawyer?

"A. Yes.

"Q When?

"A On August 24.

"Q That is after you had his statement?

"A Yes, sir."

[3]"Q After he had made known his wishes to talk to an attorney, did you, yourself, or anyone to your knowledge make any effort to secure an attorney for him?

"A I did not. I told him he was perfectly welcome to talk to an attorney at any time he wanted to; he was sitting within two feet of the telephone.

"Q Did he have the right to make telephone calls?

"A Certainly.

"Q Did you tell him that?

"A Yes.

"Q Do your notes reflect you telling him that?

"A No."

[4]"Q Did Dennis Bolinski tell you he wanted a lawyer when you were talking to him?

"A At Vandalia, no, sir; at Clark County, yes, sir.

"Q Was that before he talked to Agent Wood of the F.B.I.?

"A Yes.

"Q Did he get one?

"A When he left Clark County, en route back to Vandalia, I called the State's attorney at——

"Q State's Attorney?

"A Yes, sir, which would be our District Attorney.

"Q Prosecuting——

"A Yes, sir.

"Q ——Attorney; right?"

tory is without substance. Defendant had been arrested and was in custody in the county jail. The arrests followed receipt of a report that Mr. Taylor was missing and that his sister had never heard of defendant. When a defendant has been arrested and is questioned about the offense which occasioned the arrest, the interrogation is no longer investigatory. (*People* v. *Luker*, 63 Cal.2d 464, 474 [47 Cal.Rptr. 209, 407 P.2d 9].) The People have not met the burden of showing that the purpose of the inquiry was other than for the purpose of eliciting incriminating statements. (*People* v. *Stockman*, 63 Cal.2d 494, 499 [47 Cal.Rptr. 365, 407 P.2d 277].)

While the warnings given by Agent Wood may have met the *Escobedo* and *Dorado* standards, they failed to meet *Miranda* requirements. In addition to the *Escobedo* and *Dorado* warnings, *Miranda* requires an advisement that a suspect has the right to the presence of an attorney, either retained or appointed. It is necessary to warn "not only that he has the right to consult with an attorney, but also if he is indigent, a lawyer will be appointed to represent him." (*Miranda* v. *Arizona, supra,* 384 U.S. 436, 473 [16 L.Ed.2d 694, 722, 86 S.Ct. 1602, 10 A.L.R.3d 974].) The advisement that "if he was charged" counsel would be appointed is not a substantial equivalent of an advisement that if he is indigent he is entitled to have appointed counsel present at the interrogation. Agent Wood's affirmative answer to the question propounded on cross-examination, "Did you advise him that in the event he was unable to afford counsel, he would be provided counsel at no cost to him?" did not remedy the deficiency. In the context in which the answer was given, it is apparent that Wood was referring to the time "when charges are filed." As a foundational requirement for the introduction of extrajudicial statements made by a defendant to an officer under circumstances requiring proper warnings, the burden is on the prosecution to show that the required warnings were given. (*People* v. *Davis*, 66 Cal.2d 175, 180 [57 Cal.Rptr. 130, 424 P.2d 682]; *People* v. *Stewart, supra,* 62 Cal.2d 571, 579.) Understandably, in light of the fact that the interview occurred before *Miranda*, the prosecution failed to meet that burden. The Attorney General cites *People* v. *Valencia*, 249 Cal.App.2d 370 [57 Cal.Rptr. 567]; *People* v. *Lewis*, 244 Cal.App.2d 325 [53 Cal.Rptr. 108], for the proposition that there was a substantial compliance with the requirements of *Miranda*. However, those cases are not controlling. *Valencia* held that an advisement that defendant "could have the services of an attorney" was sufficient to sat-

isfy the requirements of *Escobedo* and *Dorado* and that defendant need not have been advised of a right to have counsel appointed to represent him at the interrogation because the trial occurred before *Miranda.* In *Lewis* the court merely held that the advice, "You don't have to talk to me now unless you want to," was a sufficient warning that the suspect had a right to remain silent.

Not having been properly advised, defendant could not have been deemed to have knowingly and intelligently waived his rights. (*People* v. *Powell,* 67 Cal.2d 32, 50 [59 Cal.Rptr. 817, 429 P.2d 137].)

In addition to the inadequacies of the warnings, the continuance of the interrogation after defendant's expressed desire for the services of an attorney rendered his statements inadmissible. "If the individual states that he wants an attorney, the interrogation must cease until an attorney is present." (*Miranda* v. *Arizona, supra,* p. 474 [16 L.Ed.2d at p. 723]; *People* v. *Luker, supra,* 63 Cal.2d 464, 474.) "The denial of the right to counsel by evasion or neglect of the suspect's request for counsel constitutes no less a constitutional violation than a denial by explicit rejection." (*People* v. *Anderson,* 63 Cal.2d 351, 362 [46 Cal.Rptr. 763, 406 P.2d 43]; *People* v. *Luker, supra.*) On the night of August 22 defendant refused to discuss how he came into possession of Taylor's car and said he wanted a lawyer. While the record is unclear whether he continued to express the same desire the following afternoon, the burden was on the People to show that he waived his right. In the light of the record, the People failed to meet that burden.

The Attorney General refers to the fact that defendant did see a lawyer. However, the record reveals that the lawyer whom he saw on the night of August 22 was the state attorney who was investigating the possibility of charging defendant with forging an invoice for a gasoline purchase in Illinois. The record does indicate that defendant did see an attorney on August 24, but this was after he had given his written statement to Agent Wood.

We turn to the People's contention that defendant is precluded from raising the issue on appeal by reason of his failure to object to the introduction of the written statement.

Although the statement was initially introduced without objections, the record shows that during the direct examination of Deputy Bender, the next witness, defendant objected

to Bender's testimony relating his conversations with the defendant and at the same time interposed a general objection "to any other statements made by defendant to law enforcement officers on the ground that corpus delicti had not been established." At this point defendant's trial counsel was permitted to associate Mr. Kellam, defendant's counsel on appeal, and the trial was recessed to afford the newly associated counsel time to prepare arguments on the objections. Mr. Kellam represented to the court that he had not had an adequate opportunity to review *Miranda* v. *Arizona, supra,* and to explore its implications. The court recessed the case to the following day but refused an extended continuance, observing that "additional motions could be made as trial progresses." The judge remarked that he had also been studying *Miranda* and the related cases since the inception of the trial.

On the following day Mr. Kellam presented a lengthy argument contending that defendant's extrajudicial statements were inadmissible both under *Miranda* and by reason of the prosecution's failure to establish corpus delicti. His argument was not specifically directed to the inadequacy of the warnings but rather to the contention that defendant was interrogated by Agent Wood when he was exhausted after a long, sleepless trip from California to Illinois and that his statements to Deputy Bender on the return trip were obtained by subtle coercion. In response, the district attorney addressed himself specifically to the admissibility under *Miranda* of each of the statements made by defendant to Agent Wood and Deputy Bender.

In the foregoing circumstances it cannot be said that defendant failed to preserve his rights to raise the *Miranda* issue on appeal. Although denominated "objections," it is apparent that defendant's trial counsel as well as the prosecution and the court treated the "objections" as a motion to strike.

While as a general rule a failure to object precludes a review of the admissibility of evidence (*People* v. *Robinson,* 62 Cal.2d 889, 894 [44 Cal.Rptr. 762, 402 P.2d 834]; *People* v. *Richardson,* 51 Cal.2d 445, 447 [334 P.2d 573]), "'technicialities should be liberally viewed when urged against a defendant in a criminal case.'" (*People* v. *Bob,* 29 Cal.2d 321, 325-326 [175 P.2d 12]; *People* v. *Briggs,* 58 Cal.2d 385, 410 [24 Cal.Rptr. 417, 374 P.2d 257].)

Although the "objections" should have been stated as a motion to strike and defendant's arguments should have been more specifically directed to the inadequacy of the warnings,

a review of the record reveals that both parties as well as the court were concerned with the admissibility of the statements in the light of *Miranda* v. *Arizona, supra.* We conclude that defendant did not waive his right to raise the *Miranda* issue on appeal.

*C. Statements to Deputy Sheriff Bender.*

 Deputy Sheriff Bender testified that prior to the commencement of the trip from Illinois to California, he asked defendant if he had been advised of his rights and whether he understood them, that defendant said that he did understand them, and that he "again informed him of his constitutional rights to remain silent; that he might have an attorney present at any time that or during any interviews, and also the statement or a statement was made somewhat to the effect that 'his attorney was here,' and I advised him that the court would appoint one in Riverside County." When asked whether he advised defendant that if he were unable to afford private counsel that one would be appointed at no cost, Bender testified that he told him that "a public defender would be furnished for him by the court."[5]

The warnings did not meet *Miranda* standards. An advisement that counsel would be appointed by the court is not the equivalent of an advisement that counsel would be provided to be present at the interrogation. Nor can defendant's statement at the prearraignment stage that he had been advised of his rights and understood them constitute a knowing and intelligent waiver of *Miranda* rights where the interrogation occurred prior to *Miranda*. (*People* v. *Powell, supra,* 67 Cal.2d 32, 50.) The People failed to meet its burden of laying a proper foundation for the introduction

[5] "Q On the first day you had told him that he had a right to a lawyer?
"A Yes sir.
"Q Did you also tell him that in the event that he was unable to afford private counsel, that he would be afforded a counsel at no cost to him?
"A Basically, that is what I told him. I told him—I told him that a public defender would be furnished for him by the court.
"Q Did you tell him the public defender would be furnished at no cost to him?
"A Yes sir, yes sir, I did.
"Q In what words?
"A I don't remember the exact words, but there was a short conversation, based on his statement to the fact that his lawyer was in Illinois, his present lawyer, at that time, was in Illinois, and I told him that the court would appoint—we have public defender's office, that the county pays, and they represent you—the court would appoint a lawyer, and they are regular lawyers.
"Q And he told you that he had an attorney at that time?
"A He stated that his attorney was in Illinois."

of the statements purportedly made by defendant to Deputy Bender in the Albuquerque, New Mexico, city jail.

 Defendant also contends that the statements he made while retracing the route he allegedly took were received in violation of *Miranda*.

The statements were not obtained in violation of *Miranda*. The request to be taken on the trip was initiated by defendant, he was then represented by the public defender, and he was accompanied by a representative of the public defender's office. A defendant who, having benefit of legal advice and while being represented by counsel, volunteers information to officers cannot complain that the information was elicited in violation of his constitutional rights. (See *People* v. *Alesi*, 67 Cal.2d 856, 861 [64 Cal.Rptr. 104, 434 P.2d 360].)

 The question remains whether the failure to exclude the statements taken by Agent Wood and the statements elicited by Deputy Bender on the return trip from Illinois requires reversal. The statements were not confessions but admissions, hence, it is necessary that we weigh their prejudicial effect in the light of the applicable "harmless error" rule. (*People* v. *Powell, supra,* 67 Cal.2d 32, 51-52.)

The statements were clearly prejudicial. They admitted that defendant and Mr. Taylor were together; they gave a highly improbable explanation for defendant's possession of the car and the use of the credit cards; the statement that defendant met Mr. Taylor on August 18th was inconsistent with other evidence showing that defendant began hitchhiking on August 20; the statement to Agent Wood that he let Mr. Taylor off at his residence in Pacific Grove was inconsistent with his later statement that he dropped him off at his home in Orange County; and his description to Agent Wood of the route he had taken rendered it highly improbable that he would have been able to be in Kingman, Arizona, at the hour testified to by Mr. Gerberding. The prosecution relied heavily upon the foregoing improbabilities and inconsistencies in arguing the case to the jury. The People have failed to demonstrate beyond a reasonable doubt that the extrajudicial statements were nonprejudicial. (*Chapman* v. *California,* 386 U.S. 18, 24 [17 L.Ed.2d 705, 710-711, 87 S.Ct 824] ; *People* v. *Caruso,* 68 Cal.2d 183, 184 [65 Cal.Rptr. 336, 436 P.2d 336] ; *People* v. *Powell, supra,* 67 Cal.2d 32, 55-56.) The judgment must, therefore, be reversed.

In view of the foregoing it is unnecessary to pass upon other issues raised by the defendant, including the admissibility of

the recorded telephone conversation between him and his sister.

Attempted appeals from the order denying new trial and the order denying motion for reduction of sentence are dismissed. Judgment reversed.

McCabe, P. J., and Kerrigan, J., concurred.

Respondent's petition for a hearing by the Supreme Court was denied May 29, 1968. McComb, J., Mosk, J., and Burke, J., were of the opinion that the petition should be granted.