**Gary James EAGAN, Petitioner–Appellant,**

v.

**Jack R. DUCKWORTH, Warden, Respondent–Appellee.**

No. 86–2178.

United States Court of Appeals, Seventh Circuit.

Argued June 2, 1987.

Decided March 22, 1988.

Rehearing and Rehearing En Banc Denied May 24, 1988.

Howard B. Eisenberg, So. Illinois University School of Law, Carbondale, Ill., for petitioner-appellant.

Michael A. Schoening, Deputy Atty. Gen., of Ind., Indianapolis, Ind., for respondent-appellee.

Before BAUER, Chief Judge,
COFFEY, Circuit Judge, and
ESCHBACH, Senior Circuit Judge.

BAUER, Chief Judge.

The petitioner, Gary Eagan, appeals from the district court's order denying his petition for a writ of habeas corpus. We reverse and remand.

### I.

The petitioner was tried and convicted by a Lake County, Indiana jury of attempted murder for stabbing a woman nine times after she refused to have sexual relations with him.

According to the evidence introduced at trial, Eagan and several companions picked up the woman as they drove through Chicago late on the evening of May 16, 1982. Sometime thereafter, Eagan, his friends and the woman met with several other men, all of whom drove together to Indiana and parked on a beach along the Lake Michigan shoreline. The woman then had sexual relations with several of the men in the group, although it is not clear from the record whether she was coerced into the sexual activities or consented upon the payment of money. Eagan, his original companions, and the woman then separated from the larger group. Shortly thereafter, they returned to the same Lake Michigan beach where Eagan and his companions apparently desired to continue their sexual activities with the woman. She refused. A struggle ensued, which ended with Eagan stabbing the woman nine times and then fleeing.

Eagan and his companions returned to Chicago where Eagan called a Chicago policeman he knew to report that he had seen the naked body of a dead woman lying on the beach along the shores of Lake Michigan. Eagan subsequently led the Chicago police to the woman. The police found the woman screaming for help, and upon seeing Eagan, the woman asked him in the presence of the police why he had stabbed her. Eagan explained to the police that he had been with the woman earlier that evening but had been attacked by several men who abducted the woman. The Chicago police turned the matter over to the Hammond, Indiana police, who requested that Eagan accompany them to the Hammond police station for questioning.

At approximately 11:00 a.m. the following morning, May 17, 1982, detectives from the Hammond Police Department questioned Eagan. Before questioning, Hammond police detectives read to Eagan, and asked him to sign, a waiver form which provided:

### YOUR RIGHTS

Before we ask you any questions, you must understand your rights. You have the right to remain silent. Anything you say can be used against you in court. You have the right to talk to a lawyer for advice before we ask you any questions, and to have him with you during questioning. You have this right to the advice and presence of a lawyer even if you cannot afford to hire one. *We have no way of giving you a lawyer but one*

*will be appointed for you, if you wish, if and when you go to court.* If you wish to answer questions now without a lawyer present, you have the right to stop answering questions at any time. You also have the right to stop answering at any time until you've talked to a lawyer.[1]

(Emphasis added.) During the ensuing interview, Eagan gave an exculpatory recitation of his activities the night of the crime.

At approximately 4:00 p.m. the following day, May 18th, the Hammond police interviewed Eagan for a second time. Before this interrogation, Eagan signed another waiver form which stated:

1. Before making this statement, I was advised that I have the right to remain silent and that anything I might say may or will be used against me in a court of law.

2. That I have the right to consult with an attorney of my own choice before saying anything, and that an attorney may be present while I am making any statement or throughout the course of any conversation with any police officer if I so choose.

3. That I can stop and request an attorney at any time during the course of the taking of any statement or during the course of any such conversation.

4. That in the course of any conversation I can refuse to answer any further questions and remain silent, thereby terminating the conversation.

5. That if I do not hire an attorney, one will be provided for me.

After reading and signing this waiver form, Eagan admitted that he had stabbed the woman and then led police to the area along the Lake Michigan shoreline where he had discarded the knife used in the stabbing as well as several items of clothing. At trial, the state court admitted Eagan's confession, the knife, and the clothing. The jury found Eagan guilty of attempted murder but acquitted him of rape. The court sentenced him to 35 years imprisonment.

## II.

■ Eagan argues that the police obtained his confession in violation of his constitutional right against self-incrimination because the first waiver form he signed failed to apprise him adequately of his right to a lawyer, if he so desired, before the police questioned him. Specifically, Eagan claims that the "if and when you go to court" passage in the sixth sentence of the waiver form was confusing and misleading and that he did not understand that the court would appoint him counsel before police interrogation.

In *United States ex rel. William v. Twomey,* 467 F.2d 1248 (7th Cir.1972), this court confronted a warning identical to the one issued to Eagan. In *Twomey,* the warning given by an Indiana State Trooper stated that the habeas corpus petitioner, Williams, had the "right to the advice and presence of an attorney whether you can afford to hire one or not. We have no way of furnishing you with an attorney, but one will be appointed for you, if you wish, if and when you go to court." *Id.* at 1249–1250 n. 1. We stated that

the warning given here was not an "effective and express explanation;" to the contrary, it was equivocal and ambiguous. In one breath appellant [Williams]

---

1. The rest of the waiver signed by Eagan provided:

WAIVER

I [petitioner filled in his name] have come to the Detective Bureau of the Hammond, Indiana Police Department, of my own choice to talk with Officers of the Hammond, Indiana Police Department, in regard to an investigation they are conducting. I know that I am not under arrest and that I can leave this office if I wish to do so.

Prior to any questioning, I was furnished the above statement of my rights at [11:14 a.m.] on [5/17/82] at [H.P.D.] by [Roger Raskosky and Thomas Baughman] of the Hammond Police Department. I have (read) (had read to me) this statement of my rights. I understand what my rights are. I am willing to answer questions and make a statement. I do not want a lawyer. I understand and know what I am doing. No promises or threats have been made to me and no pressure of any kind has been used against me.

Signed [Eagan]

was informed that he had the right to appointed counsel during questioning. In the next breath, he was told that counsel could not be provided until later. In other words, the statement that no lawyer can be provided at the moment and can only be obtained if and when the accused reaches court substantially restricts the absolute right to counsel previously stated; it conveys the contradictory message that an indigent is first entitled to counsel upon an appearance in court at some unknown, future time. The entire warning is therefore, at best, misleading and confusing and, at worst, constitutes a subtle temptation to the unsophisticated, indigent accused to forego the right to counsel at this critical moment.

*Id.* at 1250.

Although over fifteen years have passed since this court rendered *Twomey*, it remains the "seminal case in this circuit dealing with the issue of ambiguously worded *Miranda* warnings," *Emler v. Duckworth*, 549 F.Supp. 379, 381 (N.D.Indiana, 1982). We see no reason to stray from its teachings now. The "internal inconsisten[cies]", *United States ex rel. Placek v. State of Illinois*, 546 F.2d 1298, 1300 (7th Cir.1976), inherent in this type of warning are no less ambiguous and misleading today than they were fifteen years ago. The "if and when" language limits and conditions an indigent's right to counsel on a future event. The warning suggests erroneously that only those accused who can afford an attorney have the right to have one present before answering any questions; those who are not so fortunate must wait. This language further implies that if the accused does not "go to court," i.e. the government does not file charges, the accused is not entitled to an attorney at all.

Thus, this warning is constitutionally defective because it denies an accused indigent a clear and unequivocal warning of the right to appointed counsel before any interrogation. *Twomey*, 467 F.2d at 1250. We caution that our holding does not re-

quire that the police furnish an accused with counsel immediately. *See, e.g., Placek*, 546 F.2d at 1300. Nor do we urge police officers to make this appointment. The problem with the warning given Eagan is not its lack of immediacy but its confusing linkage of an indigent's right to counsel before interrogation with a future event. This potential misunderstanding violates *Miranda. California v. Prysock*, 453 U.S. 355, 360, 101 S.Ct. 2806, 2809, 69 L.Ed.2d 696 (1981).[2]

### III.

Under *Oregon v. Elstad*, 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985), Eagan's second statement was not necessarily tainted by the initial infirm warning. This conclusion, however, does not obviate our responsibility to determine whether Eagan's waiver of rights before the second statement was knowing and intelligent— the defendant's main argument on appeal. Although Eagan's second statement was made voluntarily, this conclusion does not end our inquiry. In addition to being voluntary, a "waiver must have been made with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it." *Moran v. Burbine*, 475 U.S. 412, 421, 106 S.Ct. 1135, 1141, 89 L.Ed.2d 410 (1986).

Eagan argues that his second waiver was not knowingly and intelligently given because of the misapprehension caused by the initial warning, and the failure of the second warning to correct that misapprehension. This argument is not defeated by a determination that the second statement probably was not tainted by the improper warnings given prior to the first statement. When a defendant gives a statement while in custody, the government has the burden of showing that the defendant knowingly and intelligently waived his rights. *United States ex rel. Williams v. Twomey*, 467 F.2d 1248, 1251 (7th Cir.1972). Whether a waiver was knowing and intelligent is a

---

2. Interestingly, in *Richardson v. Duckworth*, 834 F.2d 1366, 1371 (7th Cir.1987), Judge Coffey cited *Twomey* with approval (although he distin-

guished it from *Richardson*) for the precise principle the majority now affirms and he attacks.

question of fact, *Perri v. Director, Department of Corrections,* 817 F.2d 448, 451 (7th Cir.1987), requiring an evaluation of all the surrounding circumstances. *Elstad,* 410 U.S. at 318, 105 S.Ct. at 1298.

As a result of the first warning, Eagan arguably believed that he could not secure a lawyer during interrogation. The second warning did not explicitly correct this misinformation. Of course, we know very little about the factual circumstances surrounding these events because the state courts did not directly examine this issue. These are not matters for appellate determination and have not been adequately determined below. Accordingly, we remand for a determination of whether the defendant knowingly and intelligently waived his right to the presence of an attorney during the second interrogation.

REVERSED AND REMANDED.

COFFEY, Circuit Judge, dissenting.

This court recently observed that "the Supreme Court has never mandated that law enforcement officers use certain 'magic words' to inform a defendant of his rights." *Richardson v. Duckworth,* 834 F.2d 1366, 1370 (7th Cir.1987). Nonetheless, the majority reaffirms *United States ex rel. Williams v. Twomey,* 467 F.2d 1248 (7th Cir.1972), resurrecting "an overly technical application of the *Miranda* rule." *Id.* at 1253 (Pell, J., dissenting). The majority's application of *Twomey* is inconsistent with the reasoning and holding of *Richardson,* as well as our earlier decision in *United States v. Johnson,* 426 F.2d 1112 (7th Cir.), *cert. denied,* 400 U.S. 842, 91 S.Ct. 86, 27 L.Ed.2d 78 (1970), and is contrary to the great weight of authority. Thus, I respectfully dissent. Further, assuming *arguendo,* that *Twomey* retains its validity, rendering the petitioner's initial statement inadmissible since it was made in technical violation of *Miranda,* I would still affirm the district court. The petitioner

received a subsequent constitutionally sufficient *Miranda* warning and voluntarily and knowingly waived his rights before confessing to stabbing the victim.

## I.

The petitioner was tried and convicted before a jury in Lake County, Indiana, of attempted murder.[1] According to the evidence, Eagan and at least two companions picked up the woman as they drove through South Chicago, Illinois, late on the evening of May 16, 1982. The victim testified that sometime thereafter she, Eagan, and his companions, met some other men and decided to drive to Indiana and visited on a beach on the Lake Michigan shoreline. Sometime thereafter, the victim had sexual relations with at least three of the men in the group, although it is not clear from the record whether she was coerced or consented to engaging in the sexual activities. Eventually, it appears that the defendant, his companions, and the woman left the lakefront but returned later to the same beach area. The woman refused to engage in further sexual relations at which time, according to the victim's testimony, the defendant repeatedly stabbed her (9 times) and left the scene with his companions.

The petitioner returned to Chicago where he called the Chicago police and requested to talk to Officer LoBianco, with whom he was acquainted. LoBianco testified at trial that he and another officer went to an apartment building in Chicago and met Eagan. Eagan, denying his guilt, informed LoBianco that "he would like to take [him] to an area where he spotted a body." According to LoBianco's testimony, Eagan further elaborated, stating that "he found a naked woman dead" at the lakefront. LoBianco's earlier deposition testimony regarding his conversation with Eagan on the way to the lakefront was read into the trial record at this time as follows:

1. The record filed with the court on appeal did not contain the transcript of the November 19, 1982, pre-trial suppression hearing. Fortunately, with the aid and urging of this court's clerk, we have recently been provided with the suppression hearing transcript. The supplemented record before us provides us with the facts most necessary for us to decide the petitioner's federal claims, thus I would reject Eagan's assertion that he is entitled to an evidentiary hearing in the district court.

"I kept asking him, 'Are you sure what you're telling me is true? Do you know what you are saying to me?', all this stuff. I kept asking him and asking him. This was a story about a homicide. What is a homicide? It's hard to say. So she was just laying there not breathing, nothing. No movement on her or nothing. And, during the whole—going to the area this is when this conversation was going on. Okay, at that time he was just somebody that found a woman, okay, dead in the weeds."

The petitioner led the Chicago police to the exact location in a wooded area along Lake Michigan in Indiana, a short distance from the Illinois–Indiana border where the police found the victim moaning and screaming for help. LoBianco further testified that upon seeing the petitioner, the victim spoke up, and addressing her statements to Eagan, stated: "Why did you stab me? Why did you stab me?"

At this time LoBianco's partner called an ambulance and the victim was conveyed to a hospital. Eagan accompanied the officers to the hospital where he was initially questioned concerning his alleged discovery of a nude woman's body. The petitioner explained to LoBianco that he had come across the nude body while "he was out there for a party." At approximately 7:30 a.m. two Chicago police detectives took over the investigation and escorted Eagan back to the lakefront. At that time, the Chicago police, noting that the crime had been committed in Indiana, turned the matter over to the Indiana authorities for further investigation. Hammond Police Detectives Raskosky and Baughman arrived on the scene at approximately 8 a.m. the morning of May 17.

Officer Raskosky, while testifying at trial in answer to an interrogatory, stated that initially he believed that Eagan was only a possible witness to the stabbing. Raskosky further testified that the petitioner informed him that:

"he [Eagan] had been attacked earlier in the evening by several subjects. He was beaten, and he requested that he wanted to make out a police report, obtain a warrant for those subjects. So he voluntarily went to the Robertsdale Station [a Hammond police station] to make out a report with Officer Lora."

Officer Lora transported the defendant to the Hammond police station.

While at the police station, Eagan filed a battery complaint stating he had been with the victim at the lakefront and that she departed from the area with three men in a van. He further reported that these same three individuals in the van threw bottles at his car and attacked him, striking him in the face. Subsequently, Detectives Raskosky and Baughman arrived at the Hammond (Robertsdale) station and asked Eagan "if he would willingly come to the main station" to make a statement. Eagan agreed, and the detectives transported the petitioner to the Hammond police headquarters.

At 11:14 a.m. the morning of May 17, before Detectives Raskosky and Baughman questioned the petitioner about the stabbing of the woman, Detective Raskosky informed the petitioner of his constitutional rights, reading the following warning from a Hammond Police Department form entitled "Voluntary Appearance; Advice of Rights" [2]:

**2.** Officer Raskosky testified at the November 19, 1982, pre-trial suppression hearing that the warning from the "Voluntary Appearance" form was given only to those individuals who "voluntarily appeared to give a statement." The completed "Voluntary Appearance" form provided:

*"VOLUNTARY APPEARANCE;*
*ADVICE OF RIGHTS*
*YOUR RIGHTS*

Before we ask you any questions, you must understand your rights. You have the right to

remain silent. Anything you say can be used against you in court. You have the right to talk to a lawyer for advice before we ask you any questions, and to have him with you during questioning. You have this right to the advice and presence of a lawyer even if you cannot afford to hire one. We have no way of giving you a lawyer, but one will be appointed for you, if you wish, if and when you to to court. If you wish to answer questions now without a lawyer present, you have the right to stop answering questions at any time. You also have the right to stop answering at any time until you talk to a lawyer.

"Before we ask you any questions, you must understand your rights. You have the right to remain silent. Anything you say can be used against you in court. You have the right to talk to a lawyer for advice before we ask you any questions, and to have him with you during questioning. You have this right to the advice and presence of a lawyer even if you cannot afford to hire one. *We have no way of giving you a lawyer, but one will be appointed for you, if you wish, if and when you go to court.* If you wish to answer questions now without a lawyer present, you have the right to stop answering questions at any time. You also have the right to stop answering at any time until you've talked to a lawyer."

(Emphasis added). In his initial statement Eagan provided the detectives with an ex-

### WAIVER

I, [*Gary Eagan*] have come to the Detective Bureau of the Hammond, Indiana Police Department, of my own choice to talk with Officers of the Hammond, Indiana Police Department, In [sic] regard to an investigation they are conducting. I know that I am not under arrest and that I can leave this office if I wish to do so.

Prior to any questioning, I was furnished the above statement of my rights at [*11:14* a.m.] on
(time)
[*5–7–82*] at [*H.P.D.*] by [*ROGER RAS-*
(date)     (place)
KOSKY & THOMAS BAUGHMAN] of the Hammond Police Department. I have (read) (had read to me) this statement of my rights. I understand what my rights are. I am willing to answer questions and make a statement. I do not want a lawyer. I understand and know what I am doing. No promises or threats have been made to me and no pressure of any kind has been used against me.

Signed [*Gary J. Eagan*]

[11:16 a.m. 5/17/82 H.P.D.]
(time)        (date)       (place)

Witness [*Sgt. Roger A. Raskosky*]

Witness _____

Okey [sic] to take your photo: [*Gary Eagan*]

Date ____ ____ ____ Time ____ _____."

**3.** *Officer Raskosky testified at the pre-trial suppression hearing that after an individual is arrested or placed in custody, he/she is orally advised of his/her rights using the "Waiver and Statement" form instead of the "Voluntary Appearance" form. Compare the following "Waiver and Statement" form with the "Voluntary Appearance" form in footnote 2:*

culpatory recitation of his activities the night of the crime consistent with those recounted in his battery complaint. The petitioner admitted that he had been with the woman earlier in the evening and had engaged in sexual activity with her, but stated that she left him to join "three other guys" in a van. Again, Eagan asserted that these same men attacked him later that same morning.

Eagan subsequently was placed in custody in the "record lock-up" located in the basement of the Hammond police headquarters. Some 29 hours later on the following day, May 18th, Detectives Raskosky and Baughman interviewed the petitioner for a second time. Detective Baughman testified at trial that the petitioner was again fully advised of his rights at 4:21 p.m. by Detective Raskosky who read him a waiver of rights form,[3] which provided:

*"WAIVER AND STATEMENT*
     *HAMMOND POLICE DEPARTMENT*
     CASE # [*82–14893*]
DATE [*5-18-82*] PLACE [*H.P.D.*] TIME STARTED [*4:21 P.M.*]
     I, [*GARY EAGAN*], AM [*22*] years old. My date of birth is [*5-23-59*], I live at [*13302 BALTIMORE AVE.*]. The person to whom I give the following voluntary statement, [*SGT. RASKOSKY*] [*BAUGHMAN*], having identified and made himself known as a [*DETECTIVES*] of the Hammond Indiana Police Department, DULY WARNED AND ADVISED ME, AND I KNOW:
     1. Before making this statement, I was advised that I have the right to remain silent and that anything I might say may or will be used against me in a court of law.
     2. That I have the right to consult with an attorney of my own choice before saying anything, and that an attorney may be present while I am making any statement or throughout the course of any conversation with any police officer if I so choose.
     3. That I can stop and request an attorney at any time during the course of the taking of any statement or during the course of any such conversation.
     4. That in the course of any conversation I can refuse to answer any further questions and remain silent, thereby terminating the conversation.
     5. That if I cannot hire an attorney, one will be provided for me.
                    *WAIVER*
     I have read the foregoing statement of my rights and I am fully aware of the said rights. I do not desire the services of any attorney at this time and before proceeding with the making of any statement or during the course of

"1. Before making this statement, I was advised that I have the right to remain silent and that anything I might say may or will be used against me in a court of law.

2. That I have the right to consult with an attorney of my own choice before saying anything, and that an attorney may be present while I am making any statement or throughout the course of any conversation with any police officer if I so choose.

3. That I can stop and request an attorney at any time during the course of the taking of any statement or during the course of any such conversation.

4. That in the course of any conversation I can refuse to answer any further questions and remain silent, thereby terminating the conversation.

5. That if I cannot hire an attorney, one will be provided for me."

Eagan then read the waiver form aloud to the officers and Raskosky asked him whether he understood his rights. Eagan replied he did. Detective Baughman testified that Eagan appeared to understand his rights. Both detectives observed him sign the waiver of rights form at 4:23 p.m. An hour later, at 5:25 p.m., Eagan completed his second statement, giving a full confession concerning the stabbing of the woman.

The following morning, May 19, Eagan led Officers Raskosky, Baughman and Myszak to the area along the Lake Michigan shoreline where the police recovered the knife used in the stabbing of the victim as well as several items of her clothing which Eagan had previously discarded. At the state trial, the court received Eagan's two statements and also the knife and clothing the police had recovered, over the petitioner's objection. The jury found the petitioner guilty of attempted murder but acquitted him of rape; he was sentenced to a term of 35 years' imprisonment.

II.

In spite of the fact that Eagan initially (voluntarily) contacted the police and reported seeing a nude, dead body and in light of the record revealing that Eagan on at least two occasions waived his *Miranda* rights and confessed, the majority holds that the petitioner's initial *Miranda* warning was constitutionally defective and tainted his second waiver of rights "because of the misapprehension caused by the initial warning."[4] I disagree and would hold that the initial warning given Eagan was constitutionally sufficient. Further, I would overrule *United States ex rel. Williams v. Twomey,* 467 F.2d 1248 (7th Cir.1972), and *United States v. Cassell,* 452 F.2d 533 (7th

any conversation with any police officers, and hereby waive said right. No promises or threats have been made to me and no pressure or coercion of any kind has been used against me to procure any statement or induce any conversation. That the statement I am about to give is the truth and that I give it of my own free will.

        (Signed) [*Gary J. Eagan*]
TIME [*4:23 p.m.*] DATE [*5–18–82*]
I have read each page of this statement and waiver, consisting of [*2*] pages, each page of which bears my signature, and corrections, if any, bear my initials, and I certify that the facts contained herein are true and correct.

This statement was completed at [*5:25 PM*] M, on the [*18*] day of [*MAY*], 19[*82*].
        (Signed) [*Gary J. Eagan*]
        *CERTIFICATION*
I hereby certify that the foregoing warning and waiver was explained and read by me to the above signatory, and that he also read it and has affixed his signature hereto in my presence, and that I will so testify in court.

*[Sgt. Roger A. Raskosky]*"

4. Detective Raskosky testified at the pre-trial hearing that the petitioner was not under arrest at the time he gave the initial exculpatory statement. Under these circumstances, Eagan would not have been entitled to *Miranda* warnings nor would the law enforcement officers have been obligated to apprise him of his rights. *See, e.g., California v. Beheler,* 463 U.S. 1121, 103 S.Ct. 3517, 77 L.Ed.2d 1275 (1983); *U.S. v. Bush,* 820 F.2d 858 (7th Cir.1987). Because I would hold that Eagan was initially properly apprised of his rights, and in the alternative that the admissibility of the petitioner's initial statement is irrelevant to our holding in light of *Elstad,* the issue of whether the petitioner was actually in custody at the time he provided the Hammond police with an exculpatory tale of the events which occurred during the late evening and early morning hours of May 16 and 17, 1982, need not concern us.

Cir.1971),[5] to the extent these cases hold otherwise and join Judge Pell in his rejection of "an overly technical application of the *Miranda* rule." *Twomey,* 467 F.2d at 1253 (Pell, J., dissenting).

In *Twomey,* the defendant, Williams, was given the following *Miranda* warning:

"Before we ask you any questions, it is our duty as police officers to advise you of your rights and to warn you of the consequences of waiving your rights.

You have the absolute right to remain silent.

Anything you say to us can be used against you in court.

You have the right to talk to an attorney before answering any questions and to have an attorney present with you during questioning.

You have this same right to the advice and presence of an attorney whether you can afford to hire one or not. *We have no way of furnishing you with an attorney, but one will be appointed for you, if you wish, if and when you go to court.*

If you decide to answer questions now without an attorney present, you will still have the right to stop answering at any time. You also have the right to stop answering any time until you talk to an attorney."

*Twomey* held, as does the majority today, that this warning is equivocal and ambiguous and constitutes a *per se* violation of *Miranda.* This formalistic, technical and unrealistic application of *Miranda* has been soundly rejected by the vast majority of other circuits deciding the issue, i.e., the Fifth, Second, Fourth, Eighth, Tenth and Eleventh Circuits.

In *United States v. Lacy,* 446 F.2d 511 (5th Cir.1971), the Fifth Circuit held that a *Miranda* warning, similar to the warning given Eagan, was constitutionally sufficient. The *Miranda* warning provided:

"Before we ask you any questions, you must understand your rights; you have the right to remain silent. Anything you say can be used against you in court. You have the right to talk to a lawyer for advice *before* we ask you any questions, and to have him with you during the questioning. You have this right to the advice and *presence* of a lawyer, even if you cannot afford to hire one. *We have no way of giving you a lawyer, but one will be appointed for you, if you wish, if and when you go to court.* If you wish to answer questions now without a lawyer present, you have the right to stop answering questions at any time. *You also have the right to stop answering at any time until you talk to a lawyer."*

*Id.* at 512–13 (emphasis in original as well as added). The *Lacy* court held that "this warning comports with the requirements of *Miranda,*" and observed:

"That the attorney was not to be appointed until later *seems immaterial since Lacy was informed that he had the right to put off answering any question until the time when he did have an appointed attorney."*

*Id.* at 513 (emphasis added).[6]

The Second Circuit, in *Massimo v. United States,* 463 F.2d 1171, 1174 (2d Cir. 1972), *cert. denied,* 409 U.S. 1117, 93 S.Ct.

---

**5.** In *Cassell,* an earlier panel of this court held that the following warning was constitutionally deficient: "If you cannot afford a lawyer and want one, a lawyer will be appointed for you if and when you go to court or before a United States Commissioner."

**6.** But *see Fendley v. United States,* 384 F.2d 923 (5th Cir.1967) (holding that "the defendant was not advised, as *Miranda* requires, of his right to have *court-appointed* counsel present *during the interrogation,*" when an FBI agent advised the defendant that "if he did not have any money to obtain an attorney that the Judge, the Court, would appoint one for him when he went to court."); *Lathers v. United States,* 396 F.2d 524 (5th Cir.1968) (The officer's warning to the de-

fendant provided that "if he was unable to hire an attorney the Commissioner or the Court would appoint one for him." The court held that this warning violated the "edicts of *Miranda.*"). Initially, one observes that *Lacy* failed to mention *Fendley* and as one court stated, *Lacy* "appears to have overruled [*Fendley*] *sub silento.*" *United States v. Olivares–Vega,* 495 F.2d 827, 829 n. 8 (2d Cir.), *cert. denied,* 419 U.S. 1020, 95 S.Ct. 494, 42 L.Ed.2d 293 (1974). Further, *Lacy* cited to *Lathers,* noting that its "twin requirements were met: the defendant was informed that (a) he had the right to the presence of an attorney and (b) that the right was to have an attorney 'before he uttered a syllable.'" Thus, it appears that *Lacy* rejected the premise, implicit in *Fendley* and *Lathers,* that a *Miranda*

920, 34 L.Ed.2d 700 (1973), adopted the logical and realistic approach taken by the Fifth Circuit in *Lacy* and specifically rejected this court's contrary conclusion in *Cassell*. In *Massimo*, the defendant, again like Eagan, was advised:

"(a) You have the right to remain silent.

(b) Anything you say can be used against you in court.

(c) You have the right to talk to a lawyer for advice before we ask you any question and to have him with you during questioning.

(d) You have the same right to the advice and presence of a lawyer even if you cannot afford to hire one. *We have no way of furnishing you a lawyer but one will be appointed for you, if you wish, if and when you go to court.*

(e) If you decide to answer questions now without a lawyer present you will still have the right to stop answering at any time. You also have the right to stop answering at any time until you talk to a lawyer."

*Id.* at 1173. The court held that this warning was "adequate" under *Miranda*, stating:

"... Massimo was clearly warned that he could have a lawyer present *during* questioning. *The only conclusion Massimo would have been justified in reaching on the basis of the warning was that, since he was clearly entitled to have a lawyer present during questioning and since no lawyer could now be provided, he could not now be questioned.*"

*Id.* at 1174 (emphasis added).[7]

Similarly, in *Wright v. North Carolina,* 483 F.2d 405 (4th Cir.1973), *cert. denied,*

415 U.S. 936, 94 S.Ct. 1452, 39 L.Ed.2d 494 (1974), the Fourth Circuit found the reasoning in *Lacy* and *Massimo* persuasive and sustained the sufficiency of the warning given the defendant. In *Wright,* the defendant was apprised of his rights as follows:

" 'Before we ask you any questions, you must understand your rights. You have the right to remain silent. Anything you say can be used against you in court. You have the right to talk to a lawyer for advice before we ask you any questions, and to have him with you during questioning. You have this right to advice and presence of a lawyer even if you cannot afford to hire one. *We have no way of giving you a lawyer, but one will be appointed for you if you wish, if and when you go to Court.* If you wish to answer questions now without a lawyer present, you have the right to stop answering questions at any time. You also have the right to stop answering at any time until you talk to a lawyer.' "

*Id.* at 410 (emphasis added). In upholding the validity of the *Miranda* warning as given, the Fourth Circuit observed that:

" 'Stripped of its cry of pain, defendant's contention is simply that he was entitled to be warned not only of *his right to counsel, but of his right to instant counsel. Miranda, however, does not require that attorneys be producible on call, or that a Miranda warning include a time table for an attorney's arrival.* Nor does it seem to us requisite that the officer conducting the *interview declare his personal and immediate power to summon an attor-*

---

warning was *per se* insufficient if the warning contained language conditioning an indigent's right to appointed counsel on some future event. The continuing validity of *Lathers* has also been questioned by the Eleventh Circuit in *United States v. Contreras,* 667 F.2d 976, 978–79 (11th Cir.), *cert. denied,* 459 U.S. 849, 103 S.Ct. 109, 74 L.Ed.2d 97 (1982). It appears the *Contreras* court found that *California v. Prysock,* 453 U.S. 355, 101 S.Ct. 2806, 69 L.Ed.2d 696 (1981), effectively overruled *Lathers.*

7. *See also United States v. Lamia,* 429 F.2d 373 (2d Cir.), *cert. denied,* 400 U.S. 907, 91 S.Ct. 150, 27 L.Ed.2d 146 (1970); *United States v. Carneglia,* 468 F.2d 1084 (2d Cir.1972), *cert. denied,* 410 U.S. 945, 93 S.Ct. 1391, 35 L.Ed.2d 611 (1973); *United States v. Olivares–Vega,* 495 F.2d 827 (2d Cir.), *cert. denied,* 419 U.S. 1020, 95 S.Ct. 494, 42 L.Ed.2d 293 (1974); *United States v. Floyd,* 496 F.2d 982 (2d Cir.), *cert. denied,* 419 U.S. 1069, 95 S.Ct. 654, 42 L.Ed.2d 664 (1974); *United States v. Burns,* 684 F.2d 1066 (2d Cir.1982), *cert. denied,* 459 U.S. 1174, 103 S.Ct. 823, 74 L.Ed.2d 1019 (1983).

*ney.* The adequacy of the warning *is not jeopardized by the absence of such embellishments.' "*

*Id.* at 407 (quoting *Mayzak v. United States,* 402 F.2d 152, 155 (5th Cir.1968)) (emphasis added).

The Eighth Circuit too has had the opportunity to evaluate the sufficiency of *Miranda* warnings similar to those given Eagan. In *Klingler v. United States,* 409 F.2d 299 (8th Cir.), *cert. denied,* 396 U.S. 859, 90 S.Ct. 127, 24 L.Ed.2d 110 (1969), law enforcement officers read the defendant a "Standard Treasury Department *Miranda* warning" providing:

> " 'Before we ask you any questions, it is my duty to advise you of your rights. You have the right to remain silent. Anything you say can be used against you in court, or other proceedings. You have the right to consult an attorney before making any statement or answering any question, and you may have him present with you during questioning. *You may have an attorney appointed by the United States Commissioner or the court to represent you if you cannot afford or otherwise obtain one.* If you decide to answer questions now with or without a lawyer, you still have the right to stop the questioning at any time, or to stop the questioning for the purpose of consulting a lawyer. However, you may waive the right to advice of counsel and your right to remain silent, and you may answer questions or make a statement without consulting a lawyer if you so desire.' "

*Id.* at 307–08 (emphasis added). Subsequently, the officer "reiterated in his own words for the [defendant's] benefit the contents of the form:

> '[I]t means you don't have to talk to me if you don't want to, and if you do decide to talk to me, that you can stop the questioning anytime. It means that you have the right to have an attorney present with you at this time; and it means that if you do say anything, that it can be used against you later; and *that you do have the right to have an attorney appointed by the Court for*

*you if you are later charged with a Federal offense.' "*

*Id.* at 308 (emphasis in original). Subsequently, the defendant contended that these *Miranda* warnings were insufficient and that his inculpatory statements made pursuant to these warnings were erroneously received in evidence. The Eighth Circuit rejected the defendant's assertions, holding:

> " 'The fact that the [officer] ... truthfully informed [the defendant] ... that the [officer] ... could not furnish a lawyer until federal charges were proffered against him does not vitiate the sufficiency of an otherwise adequate warning. * * * *Miranda* * * * does not require that attorneys be producible on call, or that a Miranda warning include a time table for an attorney's arrival. * * * To so hold would be to allow a defendant to use his right to an attorney as a weapon against his custodians. He would simply argue if you will not furnish me an attorney now, even though I am told that I can remain silent, I will talk and after talking object to my words going into evidence. This argument is both hollow and specious.' "

*Id.* (quoting *Mayzak v. United States,* 402 F.2d 152, 155 (5th Cir.1968)). Further, in *Tasby v. United States,* 451 F.2d 394, 398 (8th Cir.1971), *cert. denied,* 405 U.S. 992, 92 S.Ct. 1262, 31 L.Ed.2d 459 (1972), the defendant challenged as inadequate a *Miranda* warning advising him "that an attorney would be appointed 'at the proper time.' " The Eighth Circuit held: "This statement, even though a slight deviation from the *Miranda* prescription, *does not negate the over-all effectiveness of the warning."* *Id.* at 398–99 (emphasis added).

The Tenth Circuit has also specifically rejected hyper-technical applications of *Miranda.* In *Coyote v. United States,* 380 F.2d 305, 307 (10th Cir.), *cert. denied,* 389 U.S. 992, 88 S.Ct. 489, 19 L.Ed.2d 484 (1967), the court summarized the defendant's assertions, noting:

> "The specific complaint here is that the mandate of *Miranda v. State of Arizona,* ... was not observed because the

clause in the written statement that ' * * * I can talk to a lawyer or anyone before saying anything, and that the judge will get me a lawyer if I am broke' reflects that appellant was not informed with sufficient clarity of his right to a court appointed attorney at the time the statement was made. Thus he seems to say in effect that at most the Agent advised him only that he could talk to a lawyer before making the statement if he could afford to hire one, and that the judge would appoint a lawyer when he came to trial if he could not afford one." The court held that the defendant "had been adequately advised of his constitutional right to the assistance of counsel," *Id.* at 309, after rejecting the defendant's purely technical and nitpicking arguments.[8] The court set forth a reasonable and appropriate standard for determining the sufficiency of a particular *Miranda* warning (the standard recently fully embraced by this court in *Richardson v. Duckworth,* 834 F.2d at 1370):

> "... Surely Miranda is not a ritual of words to be recited by rote according to didactic niceties. What Miranda does require is meaningful advice to the unlettered and unlearned in language which he can comprehend and on which he can knowingly act. *We will not indulge semantical debates between counsel over the particular words used to inform an individual of his rights. The crucial test is whether the words in the context used,* considering the age, background and intelligence of the individual being interrogated, *impart a clear, understandable warning of all of his rights.*"

380 F.2d at 308 (emphasis added). The Tenth Circuit further noted that "it is for the court to objectively determine whether in the circumstance of the case the words used were sufficient to convey the required warning." *Id.* Essentially the Tenth Circuit rejected a *per se* analysis (articulated today by the majority) for evaluating the adequacy of a specific *Miranda* warning and instead objectively evaluated both the words used to convey the warning as well as the circumstances in which it was given.

More recently, the Eleventh Circuit, in *United States v. Contreras,* 667 F.2d 976 (11th Cir.), *cert. denied,* 459 U.S. 849, 103 S.Ct. 109, 74 L.Ed.2d 97 (1982), rejected a defendant's assertions that the *Miranda* warnings given him "failed to apprise him of his rights to have counsel appointed immediately, prior to any questioning." The defendant, Contreras, was warned by a customs officer as follows:

> " 'You have the right to consult your attorney before making any statement or answering any question, and you can have your attorney present while we interrogate you.
>
> *If you want an attorney but cannot pay for one on your own, the United States Magistrate in this city or in the Federal Court will assign you an attorney free of charge.'* "

*Id.* at 978 (emphasis added). Subsequently, a Drug Enforcement Administration special agent informed the defendant that:

> " 'You have the right to consult an attorney before making any statement or answering any question posed to you, and he can be present at the interrogation. *You have the right to be represented by an attorney who will be appointed by the United States federal magistrate or court in the event of insolvency on your part.'* "

*Id.* (emphasis added). Relying on *California v. Prysock,* 453 U.S. 355, 101 S.Ct. 2806, 69 L.Ed.2d 696 (1981), the court upheld the sufficiency of the warnings given Contreras, stating:

> "A *Miranda* warning need not explicitly convey to the accused his right to appointed counsel 'here and now,' and to

<font>8.</font> The court observed:

> "Counsel for the appellant argued in the trial court, as here, that the *wording and punctuation* of the written statement itself supports his client's understanding of the advice given to him by the Agent. Specifically he says that the comma preceding the phrase 'and the judge will get me a lawyer if I am broke' renders the sentence susceptible of the interpretation that court appointed counsel would be available only after appellant had been before the judge."

*Coyote,* 380 F.2d at 308 (emphasis added).

the extent that *Lathers* and other precedents of this court require such explicit warnings, they are overruled. *Prysock*, moreover, clearly controls the case before us. *Both the customs and DEA warnings informed appellant of his right to consult with an attorney prior to questioning, to have an attorney present during questioning, and to have counsel appointed. The warnings did not condition appointment of an attorney on any future event and therefore were not deficient."*

*Id.* at 979 (emphasis added).

After researching and reviewing our colleagues' decisions, it is clear that defendants' purely semantical and hyper-technical challenges to the sufficiency of a particular *Miranda* warning have been convincingly rejected by the Fifth, Second, Fourth, Eighth, Tenth and Eleventh Circuits. In particular, the *Lacy, Massimo,* and *Wright* courts all unequivocally held that *Miranda* warnings, identical in all relevant aspects to those given Eagan, were constitutionally sufficient. On the other hand, it appears that this circuit stands alone with its *Twomey* and *Cassell* decisions, which hold that a *Miranda* warning containing the "condemned clause" ("if and when you go to court"), is irrebuttably presumed insufficient.[9] *Twomey*, 467 F.2d at 1252. In other words, *Twomey* and *Cassell* stand for the anachronistic and formalistic proposition that giving a *Miranda* warning which contains the "condemned clause" constitutes a *per se* violation of *Miranda*. Today, the majority rejects and disregards the great weight of authority, leaving our circuit standing alone and thus in conflict with the vast majority of other circuits, and instead resurrects *Twomey*'s "overly technical application of the *Miranda* rule." *Id.* at 1253 (Pell, J., dissenting). In so doing, the majority commits a regrettable mistake.

More importantly, the majority's decision conflicts with this circuit's decision in *United States v. Johnson*, 426 F.2d 1112 (7th Cir.), *cert. denied*, 400 U.S. 842, 91 S.Ct. 86, 27 L.Ed.2d 78 (1970).[10] In *Johnson* Judge Kiley, writing for a panel of this court, which included Senior Judge Castle and Judge Kerner, clearly rejected the defendant's nitpicking challenge to his *Miranda* warning. The court stated:

"Harry Johnson was told that a lawyer would be appointed *'if and when you go to court'* and claims this did not fully advise him of his right to have an attorney present during the custodial interrogation. However, he signed a statement which, *read as a whole, complied with the Miranda requirements.* Having signed the written waiver form, without evidence to the contrary, he cannot now contend that he did not understand his rights. *See Bell v. United States*, 382 F.2d 985, 987 (9th Cir.1967), *cert. denied*,

---

**9.** In *Gilpin v. United States*, 415 F.2d 638 (5th Cir.1969), a decision predating *Lacy* and relying on *Lathers*, the defendant was warned that: "We have no way of giving you a lawyer, but one will be appointed for you, if you wish, *if you go to court.*" Although the court held that the warning ultimately violated *Miranda*, the court did not, as does the majority today, "condemn" the clause outright. Instead, the court evaluated the totality of the circumstances, noting:

"Gilpin had only a sixth-grade education. He signed the waiver and made his statement the morning after he was arrested for drunkenness. Apparently his mental faculties were not functioning fully the 'morning-after,' since he confused the date of the mail robbery with the date he was in jail. Keeping in mind the Supreme Court's admonition as to the heavy burden imposed on the prosecution to show an intelligent waiver of counsel, *we are compelled to say that Detective Gothard's initial*

---

*warning failed to convey to Gilpin that he was entitled to the appointment of an attorney 'here and now'.* We hold therefore that the first warning failed to meet *Miranda* standards."

*Id.* at 641 (emphasis added). Thus, even assuming that *Gilpin* retains its validity in light of *Lacy* and the Eleventh Circuit's reasoning in *Contreras, Gilpin* does not support the majority's assertion that "the 'if and when' language is constitutionally defective."

**10.** Significantly, the *Twomey* majority, citing to *Johnson*, conceded that "a [*Miranda*] warning including the phrase that a lawyer would be appointed for the defendant 'if and when you go to court,' ha[d] been given approval by this Court." *Twomey*, 467 F.2d at 1252–53. Further, the *Twomey* "majority opinion [did] not purport to overrule *United States v. Johnson.*" *Id.* at 1253 (Pell, J., dissenting).

390 U.S. 965, 88 S.Ct. 1070, 19 L.Ed.2d 1165 (1968)."

*Id.* at 1115–16 (emphasis added). The court obviously evaluated the *Miranda* warning utilizing the totality of the circumstances test, and we, too, should evaluate the sufficiency of the warnings given Eagan under this test. *See Richardson v. Duckworth,* 834 F.2d at 1370. Moreover, the court specifically rejected Johnson's allegation, which is identical to Eagan's, that the *Miranda* warning given him was inadequate because he "was told that a lawyer would be appointed 'if and when you go to court.'" The *Johnson* court clearly and properly rejected the defendant's assertions. Why the majority holds to the contrary is unexplained since the majority's decision leaves our circuit with conflicting cases sending mixed signals to the trial courts of this circuit.

Further, observe that in *United States ex rel. Placek v. State of Illinois,* 546 F.2d 1298 (7th Cir.1976), the defendant argued that his *Miranda* warnings were deficient because they failed to apprise him of his right to immediate appointment of counsel. There we held that the following *Miranda* warning was not constitutionally infirm:

> "Placek was advised that he had the right to remain silent; that anything he said could be used against him; that 'if he wanted an attorney present, he could have one': and that 'if he could not afford one, an attorney would be *appointed through the Court for him.'*"

*Id.* at 1300 (emphasis added). This court held that the warnings "effectively warned that [Placek] need not make any statement until he had the advice of an attorney." *Id.* Eagan was similarly warned.

In *Placek,* the defendant, as does this majority, relied on *Twomey,* but in *Placek* we distinguished *Twomey* stating that the warnings given in *Twomey* were internally inconsistent "in that they advised the accused of the right to have an attorney present during questioning, but also indi-

cated that an attorney could not be appointed until a later time." *Id.*[11] But isn't this the fact situation in the vast majority of *Miranda* cases since law enforcement officers neither have the power and authority, nor should they, to select and appoint counsel. The power to appoint counsel must continue to rest with the impartial judicial officer. Further, *Miranda* does not now and never did stand for the proposition that the "'officer conducting the interview declare his personal and immediate power to summon an attorney.'" *Wright v. North Carolina,* 483 F.2d at 407 (quoting *Mayzak,* 402 F.2d at 155). I am of the opinion that we would be far better off if we ceased to lend credence to these meaningless and technical distinctions and instead consider each *Miranda* warning "read as a whole," *Johnson,* 426 F.2d at 1115, and determine whether under the circumstances the defendant understood his right to remain silent, both before and during questioning, until he consulted with a retained or appointed attorney. In other words, "a slight deviation from the *Miranda* prescription, does not negate the over-all effectiveness of the warning." *Tasby v. United States,* 451 F.2d at 398–99.

Further, the *Miranda* warnings initially given Eagan are sufficient under *California v. Prysock,* 453 U.S. 355, 101 S.Ct. 2806, 69 L.Ed.2d 696 (1981), although the majority would like its readers to believe the contrary. In *Prysock* the following events transpired:

> "On January 30, 1978, Mrs. Donna Iris Erickson was brutally murdered. Later that evening respondent and a codefendant were apprehended for commission of the offense. Respondent was brought to a substation of the Tulane County Sheriff's Department and advised of his *Miranda* rights. He declined to talk and, since he was a minor, his parents were notified. Respondent's parents arrived and after meeting with them respondent decided to answer police questions. An officer questioned respondent, on tape,

---

**11.** Today, the majority, echoing the technical distinction made in *Placek,* holds "The 'if and when' language is constitutionally defective because it may lead an indigent accused to believe that he is entitled to counsel *only* if and when he 'goes to court,' and not prior to police interrogation."

with respondent's parents present. The tape reflects that the following warnings were given prior to any questioning:

'Sgt. Byrd: ... Mr. Randall James Prysock, earlier today I advised you of your legal rights and at that time you advised me you did not wish to talk to me, is that correct?

Randall P.: Yeh.

Sgt. Byrd: And, uh, during, at the first interview your folks were not present, they are now present. I want to go through your legal rights again with you and after each legal right I would like for you to answer whether you understand it or not.... Your legal rights, Mr. Prysock, is [sic] follows: Number One, you have the right to remain silent. This means you don't have to talk to me at all unless you so desire. Do you understand this?

Randall P.: Yeh.

Sgt. Byrd: If you give up your right to remain silent, anything you say can and will be used as evidence against you in a court of law. Do you understand this?

Randall P.: Yes.

Sgt. Byrd: You have the right to talk to a lawyer before you are questioned, have him present with you while you are being questioned, and all during the questioning. Do you understand this?

Randall P.: Yes.

Sgt. Byrd: You also, being a juvenile, you have the right to have your parents present, which they are. Do you understand this?

Randall P.: Yes.

Sgt. Byrd: Even if they weren't here, you'd have this right. Do you understand this?

Randall P.: Yes.

Sgt. Byrd: You all, uh,—if,—you have the right to have a lawyer appointed to represent you at not cost to yourself. Do you understand this?

Randall P.: Yes.

Sgt. Byrd: Now, having all these legal rights in mind, do you wish to talk to me at this time?

Randall P.: Yes.'

At this point, at the request of Mrs. Prysock, a conversation took place with the tape recorder turned off. According to Sgt. Byrd, Mrs. Prysock asked if respondent could still have an attorney at a later time if he gave a statement now without one. Sgt. Byrd assured Mrs. Prysock that respondent would have an attorney when he went to court and that 'he could have one at this time if he wished one.'"

*Id.* at 356–57, 101 S.Ct. at 2807–08. The defendant, like Eagan, contended that his *Miranda* warnings were inadequate since they failed to specifically inform him of his right to have counsel appointed prior to questioning. The Supreme Court rejected the defendant's challenges, stating "[t]his Court has never indicated that the 'rigidity' of *Miranda* extends to the precise formulation of the warnings given a criminal defendant." *Id.* at 359, 101 S.Ct. at 2809. The Court held:

"It is clear that the police *in this case fully conveyed* to respondent his rights as required by *Miranda.* He was told of his right to have a lawyer present prior to and during interrogation, and his right to have a lawyer appointed at no cost if he could not afford one. *These warnings conveyed to respondent his right to have a lawyer appointed if he could not afford one prior to and during interrogation.*"

*Id.* at 361, 101 S.Ct. at 2810 (emphasis added). It is apparent that the Court evaluated the sufficiency of the warning under the totality of circumstances test, thus implicitly rejecting the majority's *per se* approach.

The Supreme Court did point out, however, that a *Miranda* warning which in fact conditioned the right to appointed counsel on some future event could be held constitutionally infirm. The Court cited *United States v. Garcia,* 431 F.2d 134 (9th Cir. 1970) (per curiam), as an example. There the Ninth Circuit observed:

"After Garcia was arrested, federal agents repeatedly questioned her. During the course of the interrogation sessions, *the agents gave her several differ-*

ent versions of the *Miranda* bundle of warnings. *On no occasion was a warning given fully complying with Miranda.* Taken together, the warnings were inconsistent. At one point she was told that she had a right to the presence of counsel 'when she answered any questions'; on another, she was told that she could 'have an attorney appointed to represent you when you first appear before the U.S. Commissioner or the Court.'" *Id.* (emphasis added). In *Garcia,* because the defendant never received a complete warning at any one time the defendant's right to appointed counsel "was linked with some future point in time after the police interrogation." *Prysock,* 455 U.S. at 360, 101 S.Ct. at 2810. Similarly, in *People v. Bolinski,* 260 Cal.App.2d 705, 723, 67 Cal. Rptr. 347, 358 (1968), the defendant, who was then in Illinois but who was to be transferred to California, was apprised that "the court would appoint [a lawyer] in Riverside County [California]." Clearly, the defendant's right to appointed counsel was conditioned on a future event.

Unlike the defendant in *Garcia,* Eagan was completely apprised of his rights when Officer Raskosky read him the warnings from the "Voluntary Appearance: Advice of Rights" form. Additionally, the petitioner was not given "*several* different versions of the *Miranda* bundle of warnings." Further, at no time was Eagan's right to appointed counsel conditioned on a future event as was the defendant in *Bolinski* who apparently believed that he would travel some 2,000 miles before counsel would be appointed. Thus, contrary to the majority's holding, Eagan's *Miranda* warnings are sufficient under *Prysock.*

Lastly, the majority's holding is incompatible with our recent decision in *Richardson v. Duckworth.* There we observed that "with respect to the formulation of the *Miranda* warning itself, the Supreme Court has ... adopted a flexible analysis," and "has never mandated that law enforcement officers use certain 'magic words' to inform a defendant of his rights." 834 F.2d at 1370. Thus, consistent with *Prysock,* we adopted the totality of circumstances test as set forth in *Coyote v. Unit-*

ed States, supra, as "the appropriate standard to determine the sufficiency of a particular *Miranda* warning." *Richardson,* 834 F.2d at 1370.

Applying this standard to Eagan's initial *Miranda* warnings, the record conclusively establishes that Eagan was well aware of his right to have a lawyer present prior to and during interrogation. Eagan was advised that:

(1) You have the right to remain silent.

(2) Anything you say can be used against you in court.

(3) You have the *right to talk to a lawyer for advice before* we ask you any questions, and

(4) to have him with you *during questioning.*

(5) You have *this right to the advice and presence of a lawyer even if you cannot afford to hire one.*

(6) We have no way of giving you a lawyer, but one will be appointed for you, if you wish, if and when you go to court.

(7) *If you wish to answer questions now without a lawyer present, you have the right to stop answering questions at any time.*

As an appellate reviewing court, after evaluating the totality of the information given the defendant, I would hold that Eagan was clearly informed that he had the right to talk to an attorney before the police questioned him, even if he couldn't personally afford to retain one and was specifically advised of his right to appointed counsel. *Miranda* neither requires that he be told that he has the right to appointed counsel "here and now" nor " 'require[s] that attorneys be producible on call or that a *Miranda* warning include a time table for an attorney's arrival.' " *Wright,* 483 F.2d at 407 (quoting *Mayzak,* 402 F.2d at 155). Thus, in light of the great weight of authority, and in particular the *Lacy, Massimo,* and *Wright* decisions, this court's earlier *Johnson* decision, the Supreme Court's *Prysock* decision, and our recent holding in *Richardson,* I would hold that Eagan's initial warning "given as a whole," survives

constitutional scrutiny and is sufficient under *Miranda.* *Twomey,* 467 F.2d at 1254 (Pell, J., dissenting). I am convinced that we should reject the majority's technical application of *Miranda,* and I would overrule *Twomey* and *Cassell.*

### III.

Alternatively, assuming *Twomey* and *Cassell* retain their validity and thus the petitioner's initial exculpatory statement should have been suppressed since it was made in technical violation of *Miranda,* I would affirm the district court nonetheless because the Supreme Court's recent decision in *Oregon v. Elstad,* 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985), rather than the Fifth Circuit's dated holding in *Gilpin,* as urged by the petitioner, controls the admissibility of Eagan's second and incriminating confession.

There, the defendant, Gilpin, was initially arrested and charged with drunkenness, and in his *inebriated state* he blurted out that he had stolen a U.S. mail bag. The next morning the defendant "then repeated the substance of his earlier confession" pursuant to an alleged inadequate *Miranda* warning.[12] Later, the defendant was given another set of *Miranda* warnings. A few days later Gilpin was again apprised of his rights by an officer utilizing the same alleged faulty warning given originally, and again the defendant confessed.

The *Gilpin* court relied on an earlier Supreme Court decision resting on Fourth Amendment grounds which held:

"Of course, after an accused has once let the cat out of the bag by confessing, no matter what the inducement, he is never thereafter free of the psychological and practical disadvantages of having confessed. He can never get the cat back in the bag. The secret is out for good. In such a sense, a later confession always may be looked upon as fruit of the first."

*United States v. Bayer,* 331 U.S. 532, 541–42, 67 S.Ct. 1394, 1398, 91 L.Ed. 1654

(1947). Thus, relying on *Bayer,* the court in *Gilpin* observed that the defendant's initial statement made pursuant to the asserted inadequate warning led to the defendant's subsequent confession and held:

"Here ... Gilpin knew that 'the cat was out of the bag.' One confession led to another. The effect of the tainted confession was not dissipated by the time of the next confession. A belated adequate warning could not put the cat back in the bag."

*Gilpin v. United States,* 415 F.2d at 642. Here, the petitioner argues that his second incriminating statement was similarly tainted by the initial allegedly insufficient warning and thus asserts that both statements should have been suppressed. (The majority, however, asserts that "Eagan argues that his second waiver was not knowingly and intelligently given because of the misapprehension caused by the initial warning, and the failure of the second warning to correct that misapprehension.")

Even in *Bayer,* however, the Supreme Court observed that all later confessions were not necessarily tainted, stating:

"This Court has never gone so far as to hold that making a confession under circumstances which preclude its use, perpetually disables the confessor from making a usable one after those [coercive] conditions have been removed."

*United States v. Bayer,* 331 U.S. at 542, 67 S.Ct. at 1398. More recently, in *Elstad,* the Supreme Court specifically rejected the reasoning of a few courts, like the *Gilpin* court, which imputed "taint" to subsequent statements obtained pursuant to a voluntary and knowing waiver, noting:

"A handful of courts has, however, applied our precedents relating to confessions obtained under coercive circumstances to situations involving wholly voluntary admissions, requiring a passage of time or break in events before a second fully warned statement can be deemed voluntary. Far from establishing a rigid rule, we direct courts to avoid one; there is no warrant for presuming

---

**12.** The defendant was warned: "We have no way of giving you a lawyer, but one will be appointed for you, if you wish, if you go to court."

coercive effect where the suspect's initial inculpatory statement, though technically in violation of *Miranda,* was voluntary. The relevant inquiry is whether, in fact, the second statement was also voluntarily made."

*Oregon v. Elstad,* 420 U.S. at 318, 105 S.Ct. at 1298. The Supreme Court further stated: "This Court has never held that the psychological impact of voluntary disclosure of a guilty secret qualifies as state compulsion or compromises the voluntariness of a subsequent informed waiver." *Id.* at 312, 105 S.Ct. at 1295. In conclusion, the Supreme Court held "that a suspect who has once responded to unwarned yet uncoercive questioning is not thereby disabled from waiving his rights and confessing after he has been given the requisite [13] *Miranda* warnings." *Id.*

Thus I would determine initially whether Eagan's first statement, allegedly the result of a technical violation of *Miranda,* was nonetheless made voluntarily. Secondly, I analyze whether the second set of *Miranda* warnings was constitutionally sufficient, and lastly, my inquiry focuses on the voluntariness of the second and incriminating confession.

#### A. Voluntariness of Initial Statement

In *Miller v. Fenton,* 474 U.S. 104, 110, 106 S.Ct. 445, 456, 88 L.Ed.2d 405 (1985), the Supreme Court reaffirmed that the "ultimate issue of 'voluntariness' is a legal question" and as we recently noted "subject to plenary federal review." *Perri v. Director, Dep't of Corrections of Illinois,* 817 F.2d 448, 450 (7th Cir.1987). Applying this standard, my review of the record convinces me that Eagan's initial statement was voluntary. The record discloses that the petitioner *initiated* the contact with the law enforcement officers on his own, calling an acquaintance of his (LoBianco) on the Chicago police department from his apartment. Subsequently, he met with Lo-Bianco and his partner and reported that he had found the body of a nude woman and then directed and accompanied them to the scene. After leaving the scene of the crime, Eagan offered to accompany the police to the Hammond (Robertsdale) station to file a battery complaint in which he stated that he had been with the victim earlier that morning but had been attacked by the same men with whom the victim departed. Eagan went with Detectives Raskosky and Baughman to the Hammond police headquarters where he was advised of his rights. Here Eagan signed a waiver form which stated that he was "not under arrest" and was free to "leave [the] office if [he] wish[ed] to do so." Rather than leaving the station, Eagan remained and provided the officers with a statement. The record is completely barren of evidence suggesting, much less establishing, that the law enforcement officers either coerced, threatened or physically abused him. Further, the petitioner in effect concedes the issue in not claiming that his first statement was made involuntarily. I am convinced and would hold that the petitioner's initial statement, even assuming it was made in technical violation of *Miranda,* was nonetheless given freely and voluntarily.

#### B. Adequacy of the Second *Miranda* Warning

I am equally convinced that the second set of warnings recited to the petitioner were constitutionally sufficient. In *Richardson,* as I pointed out in Part II, this court observed that the Supreme Court "never mandated that law enforcement officers use certain 'magic words' to inform a defendant of his rights," and adopted the following standard articulated by the Tenth Circuit which foreshadowed the Supreme Court's decision in *Prysock:*

"'Surely *Miranda* is not a ritual of words to be recited by rote according to didactic niceties. What *Miranda* does require is meaningful advice to the unlettered and unlearned in language which he can comprehend and on which he can knowingly act. We will not indulge semantical debates between counsel over

---

**13.** The warnings referred to in this case as the "requisite" warnings are the second set of *Mi-randa* warnings given to the petitioner-appellant, Eagan.

the particular words used to inform an individual of his rights. The crucial test is whether the words in the context used, considering the age, background and intelligence of the individual being interrogated, impart a clear, understandable warning of all his rights.' "

*Richardson v. Duckworth,* 834 F.2d at 1370 (quoting *Coyote v. United States,* 380 F.2d 305, 308 (10th Cir.), *cert. denied,* 389 U.S. 992, 88 S.Ct. 489, 19 L.Ed.2d 484 (1967)). Thus, I determine under the totality of circumstances test whether the second warning administered to Eagan constituted a "fully effective equivalent" of the four essential warnings articulated in *Miranda.*

Eagan was advised of his rights for the second time as follows:

"1. Before making this statement, I was advised that I have the right to remain silent and that anything I might say, may or will be used against me in a court of law.

2. That I have the right to consult with an attorney of my own choice before saying anything, and that an attorney may be present while I am making any statement or throughout the course of any conversation with any police officer if I so choose.

3. That I can stop and request an attorney at any time during the course of the taking of any statement or during the course of any such conversation.

4. That in the course of any conversation, I can refuse to answer any further questions, and remain silent, thereby terminating the conversation.

5. That if I cannot hire an attorney, one will be provided for me."

I do not agree with the petitioner's *initial* assertion that this warning is deficient because "[a]t no time was [he] informed of his right to have an attorney appointed prior to or during the interrogation," App. Br. at 11, since the warning, considered in its totality, makes clear that he is entitled to appointed counsel before and during questioning if he so desired. Further, the record establishes that the petitioner, a 22–year-old adult, affixed his signature in longhand to the waiver form, after reading the waiver form aloud, demonstrating the requisite intellectual ability to understand the basic and essential warnings given him. Thus, I would reject Eagan's attempt to trivialize and find fault with the recited second *Miranda* warning.

Secondly, the petitioner asserts, and the majority echoes, that the second *Miranda* warning "when viewed together with the first warnings" did not adequately inform him of his "right to have assigned counsel present at the second interrogation." App. Br. at 11. The petitioner notes that the second *Miranda* warnings "speak only of 'counsel of my own choice' and never states how or when counsel would be provided if the accused is indigent." *Id.* at 12. Eagan asserts that the respondent "failed to show that the second statement was sufficiently attenuated from the first statement." *Id.* I deem Eagan's assertions as meritless because (1) he makes only bald allegations and fails to articulate or delineate in any manner how or why the initial warning tainted the second warning; and (2) as I observed, the complete second warning clearly explains that Eagan would have been provided with appointed counsel before and during the second interrogation had he so requested. Further, as pointed out by the Supreme Court, no "purpose is served by imputing 'taint' to subsequent statements obtained pursuant to a voluntary and knowing waiver" where the initial statement was voluntary. *Oregon v. Elstad,* 470 U.S. at 318, 105 S.Ct. at 1298.[14]

14. The petitioner argues that the Court's decision in *Brown v. Illinois,* 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975), requires that the state has the "burden of showing attenuation," App. Br. at 12; thus, Eagan asserts that "absent a more developed record, the second statement should have been suppressed as tainted by the initial statement." *Id.* at 12–13. In *Brown* the defendant made two incustody post-*Miranda* statements subsequent to his *unlawful* arrest. The Court held that the giving of *Miranda* warnings alone "cannot make the act [the confession] sufficiently a product of free will to break, for *Fourth Amendment purposes,* the causal connection between the illegality and the confession." 422 U.S. at 603, 95 S.Ct. at 2261 (emphasis added). Petitioner has not argued that the Fourth Amendment has been violated in this

Thus, I would hold that the second set of *Miranda* warnings given Eagan were constitutionally antiseptic, and thus sufficient.

Lastly, assuming *arguendo* that *Gilpin* applied to the facts before us, my decision would be unaffected. Gilpin, unlike Eagan, actually confessed to the crime before he was given proper *Miranda* warnings. *Gilpin v. United States*, 415 F.2d at 639. Thus, the court reasoned that the defendant, regardless of whether he subsequently received an adequate *Miranda* warning, probably believed it was useless to remain silent, i.e., the defendant "could not put the cat back in the bag." *Id.* at 642. Eagan, however, never confessed to stabbing the victim until after he was given the second sufficient *Miranda* warning, thus distinguishing the present case. Officer Baughman testified, without objection, that Eagan, in his battery complaint, admitted he had been with the victim at the lakefront. The petitioner further reported that the victim willingly departed with three other men in a van and stated that these same men attacked him later. Eagan's initial challenged statement, combined with his battery complaint, both exculpatory in nature, selectively described in graphic detail the victim's alleged consensual sexual activities with him and two companions at the lakefront. It cannot even be inferred that Eagan "let the cat out of the bag" until after Detective Raskosky administered the second *Miranda* warning, at which time the petitioner confessed to the stabbing. Thus, no taint, as in *Gilpin*, can be attributed to the confession as long as it was given voluntarily. The test is simply, as the Supreme Court noted, "that a suspect who has once responded to unwarned yet uncoercive questioning is not thereby disabled from waiving his rights and confessing after he has been given the requisite *Miranda* warnings." *Oregon v. Elstad*,

420 U.S. at 312, 105 S.Ct. at 1295. Eagan was properly warned.

### C. Voluntariness of the Confession

Although the "ultimate issue of 'voluntariness' is a legal question," *Miller v. Fenton*, 474 U.S. at 110, 106 S.Ct. at 456, subject to "plenary federal review," *Perri*, 817 F.2d at 450, the findings of state courts on the subsidiary questions of whether the defendant knowingly and voluntarily waived his *Miranda* rights are entitled to the § 2254(d) [15] presumption of correctness if the state court findings are fairly supported by the record. *See, e.g., Perri v. Director, Dep't of Corrections of Illinois*, 817 F.2d 448 (7th Cir.1987) (holding that state court findings that a waiver of *Miranda* rights is knowing and intelligent are factual findings entitled on the § 2254(d) presumption of correctness); *Bryan v. Warden, Indiana State Reformatory*, 820 F.2d 217 (7th Cir.1987) (holding that the § 2254(d) presumption of correctness also applies to state court factual findings that a waiver of *Miranda* rights is voluntary.) "This is especially true, as in this case where the voluntariness issue focuses on the credibility of witnesses." *Richardson v. Duckworth*, 834 F.2d at 1372. Further, if fairly supported by the record, the state court's failure to *"expressly state"* that the defendant voluntarily and knowingly waived his *Miranda* rights does not render the § 2254(d) presumption inapplicable as long as the findings of a knowing and voluntary waiver are "implicit in a state court's opinion." *Bryan*, 820 F.2d at 221; *Perri*, 817 F.2d at 452.

Unfortunately, the majority completely disregards the holdings of our prior decisions in *Bryan* and *Perri* regarding the presumption of correctness to be applied to state court factual findings. Instead, the

---

case; thus, *Elstad*, rather than *Brown*, governs under the present circumstances.

**15.** Section 2254 provides in part:
"(d) In any proceeding instituted in a Federal court by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination after a hearing on the merits of a factual issue, made by a State court of competent jurisdiction in a proceeding to which the applicant for the writ and the State or an officer or agent thereof were parties, evidenced by a written finding, written opinion, or other reliable and adequate written indicia, shall be presumed to be correct...."
28 U.S.C. § 2254(d).

majority states "of course, we know very little about the factual circumstances surrounding these events because the state courts did not *directly* examine the issue." The majority is simply wrong.

During the November 19, 1982, pre-trial suppression hearing, Officers Raskosky and Baughman both testified that Officer Raskosky read Eagan his *Miranda* warnings from the waiver of rights form. Raskosky next testified that at this time Eagan read the waiver form back to the officers. Raskosky "asked [Eagan] if there was any part of it that he didn't understand or [was] questionable to him," and Eagan "stated that he understood everything on the form." Tr. of November 19, 1982, Suppression Hearing, p. 13. Officer Baughman also testified that Eagan understood his rights. The record further reveals that Eagan read the waiver form aloud and then signed the form.

The petitioner also took the stand at the pre-trial suppression hearing. Eagan, incredibly, testified that he didn't remember speaking with his acquaintance, Chicago Police Officer LoBianco, during the early morning hours of May 17, in spite of the fact that he [Eagan] initiated and called the police department specifically looking for LoBianco. After LoBianco responded to the call, Eagan told him an exculpatory tale of discovering a nude body at the lakefront and led him to the exact location where the victim identified him and stated: "Why did you stab me?" Continuing his charade of selective memory, the petitioner testified that he neither recollected being at the initial Hammond (Robertsdale) police station nor remembered parts of his two statements. He blamed his memory lapse on

being high, drunk and suffering from withdrawals after ingesting drugs, "some Tulenols [sic]," [16] and "Canadian Club" during the late evening hours of May 16, 1982. The petitioner's testimony at the suppression hearing was impeached on cross-examination after Eagan conceded that he had not ingested any drugs after contacting the police. The petitioner's testimony to the effect that he was "high and intoxicated" was also impeached by the fact that both challenged statements were clear, concise and fairly detailed. Further, Officer Raskosky, who had previously observed inebriated individuals, as well as those suffering from withdrawals, was recalled to the stand and testified that Eagan neither appeared to the intoxicated nor did he appear to be under the influence of drugs nor going through withdrawals. Eagan's testimony was more than suspect in the eyes of both the trial judge and this dissenter considering that Eagan was conscious enough to phone the police, meet them, and then lead them to the exact spot of the victim's moaning and screaming body, and in itself discredited the petitioner's testimony that he was so "high and intoxicated" that he couldn't remember.

After hearing all the pertinent testimony and observing each witness, the state trial judge who was in the best position to evaluate the witness's (Eagan's) credibility did not believe him and denied his motion to suppress. It is obvious that the state court regarded Eagan's testimony as incredible, *thus implicitly finding that the petitioner knowingly and voluntarily waived his second set of Miranda rights.*[17] As we recently stated, no appellate court, including this court, can or should " 'substitute

---

16. "Tuinal is a combination of equal parts of Seconal^R Sodium (secobarbital sodium, Lilly) and Amytal^R Sodium (amobarbital sodium, Lilly), barbituric acid derivatives that occur as white, odorless, bitter powders.... Tuinal, a moderately long-acting barbiturate, is a central-nervous-system depressant. In ordinary doses, the drug acts as a hypnotic. Its onset of action occurs in 15 to 30 minutes, and the duration of action ranges from three to 11 hours. It is detoxified in the liver."
*Physicians Desk Reference*, p. 1168 (41st ed. 1987).

17. Assuming the state trial court erred when it also implicitly found that Eagan knowingly and voluntarily waived his initial *Miranda* rights because he was not intoxicated at the time, Eagan would be in no better position to argue that the first *Miranda* warning somehow tainted the second warnings because according to Eagan he couldn't "remember" much of what transpired during the evening hours of May 16, 1982, or the morning of the 17th. What one does not remember cannot give rise to "misapprehensions" or reasonably "taint" a second *Miranda* warning.

its own judgment as to the credibility of witnesses' for that of the state courts." *Richardson v. Duckworth,* 834 F.2d at 1372. The majority disregards this mandate and would now remand for further factual findings. I disagree and would hold that the state court's findings are more than fairly supported by the record and therefore accord the state court's findings of fact the presumption of correctness required under § 2254(d) and further *hold that Eagan knowingly and voluntarily waived his Miranda rights.* Additionally, the record is barren of evidence from which one could infer, much less establish, that Eagan was coerced or induced to confess; nor has he even challenged the "voluntariness" of his confession. Thus, I would hold, after a detailed review of the record, given the totality of the circumstances, that Eagan's confession was voluntarily made and properly received in evidence at trial along with the knife and clothing the police recovered as a result of the petitioner's statement.

Lastly, assuming that Eagan's initial statement might conceivably have been made in technical violation of *Miranda* and should have been suppressed, its admission was *harmless error because (1) it essentially repeated the facts contained in his battery complaint, including that he had been with the victim that evening but that she had departed with three men in a van, which were received in evidence without objection; (2) he admitted only to having sexual relations with her and that she asked for money; he said absolutely nothing to implicate himself; and (3) after having been given the proper second Miranda warning, he confessed to the brutal stabbing.*

IV.

The petitioner also asserts that the trial court's instruction that voluntary intoxication was not a defense to attempted murder amounted to *a denial of his due process right.* The trial court instructed the jury that voluntary intoxication was not a defense to attempted murder because an Indiana statute operative at the time of Eagan's commission of the crime precluded voluntary intoxication as a defense to attempted murder. The Indiana Supreme Court held this statute unconstitutional, *Terry v. State,* 465 N.E.2d 1085 (Ind.1984), and subsequently held that the *Terry* decision was to be applied retroactively. *Pavey v. State,* 498 N.E.2d 1195 (Ind.1986). Thus, under Indiana law, it was error for the trial court not to instruct Eagan's jury on the defense of voluntary intoxication. However, the Supreme Court of Indiana found "no reversible error" as a result of the trial court's instruction that voluntary intoxication was not a defense to attempted murder, and the petitioner has failed to present this court with any evidence or case law that persuades me that the Indiana Supreme Court incorrectly determined the error of the state trial court was harmless. As the United States Supreme Court has explained:

"Before a federal court may overturn a conviction resulting from a state trial in which this instruction was used, it must be established not merely that the instruction is undesirable, erroneous, or even 'universally condemned,' but that it violated some right which was guaranteed to the defendant by the Fourteenth Amendment."

*Cupp v. Naughten,* 414 U.S. 141, 146, 94 S.Ct. 396, 400, 38 L.Ed.2d 368 (1977); *see also United States ex rel. Bonner v. DeRobertis,* 798 F.2d 1062, 1067 (7th Cir.1986). In rejecting Eagan's claim, the Indiana Supreme Court stated:

"Nevertheless, we find no reversible error in the court's having given the instruction. Although there was some evidence presented that the Defendant may have been intoxicated at the time he committed the crime, it was never interposed as a defense; and the record reveals that his intoxication, if existing, was not of the debilitating degree that could have raised a reasonable doubt upon the existence of the requisite *mens rea.*

Defendant did not testify. The only evidence of his intoxication came from Officer LoBianco and from Defendant's sister, Katherine Roberts. . . .

Defendant gave two statements to the police.... In neither statement, however, did Defendant make any claim that he was intoxicated or under any disability at any time during the criminal episode.

Immediately following the criminal events, Defendant drove an automobile through the city streets some considerable distance, to the home of his sister, reported the episode to her and asked for assistance for his friend who had been cut. He had the presence of mind to heed her advice and to contact Officer LoBianco, to guide him back to the scene of the crime and to fabricate a story concerning his involvement. The only relevant evidence belied a mental state so impaired by alcohol or drugs as to preclude the existence of the *mens rea.* The issue was simply not present, hence the giving of the instruction, although error, was harmless."

*Eagan v. State,* 480 N.E.2d 946, 951–52 (Ind.1985). The petitioner has not persuaded me that the Indiana Supreme Court committed error in concluding that the voluntary intoxication instruction the trial court gave constituted harmless error. Accordingly, I agree with the district court and hold that the petitioner's claim of a constitutional violation based on the voluntary intoxication instruction the state trial court gave was without merit.

## V.

For the aforementioned reasons, I respectfully disagree and dissent from the majority's decision and would affirm the order of the district court denying Eagan's petition for a writ of habeas corpus.